# Exhibit 08

**SALTAMAR INNOVATIONS**

30 Fern lane
South Portland, ME 04106
USA
Phone: +1(207) 799-9733
Fax:+1(207) 767-5324
E-mail: Shalom@Saltamar.com
HTTP://www.saltamar.com

# In the United States Patent and Trademark Office

| In re application of: | Graham Clemie, et al. | | |
|---|---|---|---|
| For: | CENTRALISED INTERACTIVE GRAPHICAL APPLICATION SERVER | | |
| Serial No. ~confirm: | 10/506,151  ~ 8293 | Group: | 2628 |
| Filed on: | Aug 31, 2004 | Examiner: | Nguyen H. Hau |
| Correspondence Date | April 17, 2008 | Docket: | 0413US-CLEMIE |

## Response

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir,

1. This document is responsive to the Office Action mailed to applicant on January 22, 2009 in the above-identified application.

2. Further, this amendment is filed with an information disclosure statement reflecting documents cited by the Japanese Patent Office in a corresponding application.

3. Applicant thanks the Examiner for his office action and hopes that this response will further the understanding of applicant's invention. The Office Action mailed on 22 January 2009 has been carefully reviewed, and these remarks are responsive thereto.

4. Applicant thanks the Examiner for withdrawing the rejections in response to the amendment filed August 26, 2008 and to the supplemental amendment filed October 15, 2008.

5. Claims 1, 2, 4-18, 20-28 are pending in the application and stand rejected.

6. The Office indicated that the amendment filed October 15 2008 was entered. However the Office Action **does not reflect the amendments** agreed upon and

-- 1 --

filed in the application. More specifically, applicant directs the Office's attention to the recitation of subparagraph (f) of claim 1(Page 4 in the Office Action) fails to recognize the deletion of commas in the sentence. Applicant respectfully requests that the application be corrected by the Office in accordance with the amendment, and that the application be considered in light thereof.

7. Claims 1, 2, 4-8, 10, 15-18 and 20 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Levoy ("Polygon-Assisted JPEG and MPEG Compression of Synthetic Images" ACM (1995) ACM-0-89791-701-4/95/008, "Levoy" hereinafter) in view of Naylor et al. (U.S. patent no. 5,742,289, "Naylor", hereinafter).

Applicant contests the rejection on at least the following grounds

**A) Naylor does not disclose the claimed 'first graphics data'**

8. The Office admits that Levoy fails to explicitly teach the steps of the applicant's claims 1(e) and 1(f) as amended, namely:

   *e) processing said second graphics data to generate compression assistance data; and*
   *f) processing said first graphics data using said compression assistance data to generate a compressed video data signal;*
   however, the Office asserts that these features are taught by Naylor, and further that it would have been obvious for the skilled in the art to combine the references.

9. The Office equated applicant's "first graphics data" of claim 1f to the product of Naylor's "graphics engine front end", the Applicant's "second graphics data" to the product of Naylor's "hybrid rendering engine" and the "compression assistance data" to the "motion vectors" produced by Naylor's "hybrid rendering engine" and used by Naylor's "video encoder back end". To facilitate visualizing these interpretations, the applicant hereby reproduces Naylor's Figure 2 with the addition of the aforementioned terms to the appropriate points. Naylor's definitions are placed at the top of the figure whilst the applicant's are placed along the bottom.



10. Figure 2 of Naylor describes a system that incorporates a "graphics engine front end" (205), a "hybrid rendering engine" (210) and a "video encoder back end" (215). Naylor teaches that, "The graphics engine front end 205 generates data structures required for creating a particular 3-D scene." (Column 3, lines 27-29) and that, "The hybrid rendering engine 210 performs conditional rendering on the 3-D objects, that is, transforming the data representing 3-D objects to data representing 2-D images." (Column 3, lines 40-42). Furthermore, the hybrid rendering engine determines the type of encoding to be performed (column 3,

lines 63-65: "Once the hybrid rendering engine 210 has determined the type of encoding to be performed…"). In column 3, lines 40 to 52 Naylor further teaches that the hybrid rendering engine produces motion vectors. The video encoder back end then encodes the images and transmits them to the television. (Column 3, line 63 to column 4, line 2: "Once the hybrid rendering engine 210 has determined the type of encoding to be performed on a successive image block, the decision is transmitted to the video encoder back end 215 which encodes the motion vector or image block and transmits the encoded motion vector or image block to the television receiver.").

11. Applicant respectfully directs the Examiner's attention to applicant's claim 1(c) which states, "processing said first set of instructions or said second set of instructions in a graphics processor module to generate first graphics data, *said first graphics data comprising image frames*." Furthermore, step 1(f) states that the compressed video data signal is produced *from* the first graphics data ("processing said first graphics data…*to generate* a compressed video data signal."). Claim 1 therefore clearly recites that "first graphics data" contains the images that are to be compressed. However, as already detailed above, Naylor states that the output of the graphics engine front end is only the "**data structures used to build a 3-D scene**" and it is the hybrid rendering engine that actually produces the 2-D images that are to be compressed. Therefore, even providing each term with the broadest reasonable meaning, the applicant's "first graphics data" cannot be properly equated to the product of Naylor's "graphics engine front end".

12. Furthermore, substituting the aforementioned interpretation of Naylor and the present application, applicant's step 1f would become, processing "data structures required for creating a particular 3-d scene" using compression assistance data (e.g. motion vectors) to generate a compressed video data signal. The skilled in the art will recognize that it is not possible to compress an image without first producing the image itself. Naylor describes in great detail how the image is first rendered before being compressed. Naylor does not teach producing a compressed video signal from the data structures of a 3-D scene using compression assistance data, (such as motion vectors by way of example),

as stipulated by the Office's interpretation of applicant's claim 1(f). Naylor only teaches compression from the rendered 2-D images. Column 3, line 63 to column 4, line 2 of Naylor states, "Once the hybrid rendering engine 210 has determined the type of encoding to be performed on a successive image block, the decision is transmitted to the video encoder back end 215 which encodes the motion vector or image block and transmits the encoded motion vector or image block to the television receiver 12 of FIG. 1." Furthermore, in column 7, lines 59 to 62, Naylor states, "The video encoder back end 215 generally performs the same encoding functions as is performed in a conventional video encoder once the encoding type decision for each image block has been determined." Naylor teaches specifically that a compressed video data signal is produced from 2-D images, and does not suggest or hint how to produce a compressed video data signal directly from data structures. Thus, applicant respectfully submits that Naylor's own definition of his "video encoder back end" proves that the applicant's "first graphics data" cannot be properly equated to the product of Naylor's "graphics engine front end".

13. Further evidence bolstering the point that applicant's 'first graphics data' cannot be properly equated to the product of Naylor's "graphics engine front end" is found in applicant's step 1(f), which states, "processing said first graphics data *using* said compression assistance data **to generate a compressed video data signal**." Naylor teaches that his hybrid rendering engine decides how to encode but does not do the encoding itself (module 315 of Figure 3; Column 3, lines 53 to column 4 line 2: "Once the hybrid rendering engine 210 has determined the type of encoding to be performed on a successive image block, the decision is transmitted to the video encoder back end 215 which encodes the motion vector or image block and transmits the encoded motion vector or image block to the television receiver 12 of FIG. 1."; column 6 line 62 to column 7, line 4: "If the accumulated prediction error for a given image block is below a predefined threshold, the block based motion vector for that image block is transmitted to the video encoder back end 215 of FIG. 2 which constructs the image block from the block based motion vector as described below (step 440 of FIG. 4).") Naylor's only input to the "hybrid rendering engine" is the output of the "graphics engine

front end", i.e. the what the Office equated to applicant's "first graphics data" used in step 1(f) which produces the compressed video data signal. By Naylor's own definition, his "hybrid rendering engine" does not have the capability to produce a compressed video data signal. Applicant therefore further submits that applicant's "first graphics data" cannot be equivalent to the product of Naylor's "graphics engine front end".

**B) Naylor does not disclose the claimed 'second graphics data'**

14. Even if, *arguendo*, the Office still considers applicant's "first graphic data" equivalent to the output of Naylor's "graphics engine front end', applicant submits that the applicant's "second graphics data" cannot be properly equated to the product of Naylor's "hybrid rendering engine".  In fact, the equivalence asserted by the Office is akin to stating that the motion vectors are produced from motion vectors and / or 2-D images.  Applicant's step 1(e) features "processing said second graphics data to generate compression assistance data." Naylor does not teach producing compression assistance data from the product of his "hybrid rendering engine", only from the product of his "graphics engine front end".  One might argue that a prediction error is equivalent to applicant's "compression assistance data". However, Fig. 4 of Naylor describes how a prediction error is determined from the 3-D model produced by the "graphics engine front-end". That prediction error is used to determine what form of encoding should be used by the "video encoder back end." Column 3, line 52 to column 4, line 2 describes that motion vectors "represent the projected direction of motion for any image of an object represented in the current image block…" (column 3, lines 52 to 54) but it does not explain how the motion vectors are calculated. Column 4 lines 30 to 43 hint at how Naylor determines motion vectors are based first on "temporal interframe correlation" which is determined *prior* to generating an image frame (see also 310 in Figure 3). Column 4, lines 44 to 50 state, "Intraframe visibility of an object depends firs fly [sic] upon whether there is an overlap of the x,y coordinate positions of the images of one or more objects within the image frame. If there is an overlap of the x,y coordinates, illustratively the position of the z coordinate for the image of each object is considered to determine the visibility of the images of each of the objects." Column 5, lines 26 to 27, state, "Interframe

visibility is an important component in determining temporal correlation." Column 5, lines 44 to 46 states, "Motion vectors can be generated from the temporal correlations for each surface point of the image." It is therefore clear that Naylor's "hybrid rendering engine" determines motion vectors from the output of the "graphics engine front end", namely, "Data structures required for creating a particular 3-D scene," (Column 3, lines 27-29).  Naylor has thus specified that his version of "compression assistance data" is derived from the output of his "graphics engine front end", i.e. "data structures required for creating a particular 3-D scene" and thus not from other compression assistance data nor 2-D images. Applicant therefore respectfully submits that as step 1(e) features "processing said second graphics data to generate compression assistance data," applicant's "second graphics data" may not be properly equated to the product of Naylor's "hybrid rendering engine" as proposed by the Office.

15. Applicant therefore respectfully submits that based on the above arguments, Naylor does not teach features and limitations of neither 1(e) nor 1(f). Furthermore, even the combined the teachings of Levoy and Naylor do not teach or suggest the invention claimed in claim 1.

**C) Levoy does not disclose the claimed step of "intercepting"**

16. The Office asserted that Levoy discloses the applicant's step 1(b) which states, "intercepting said first instructions and generating a second set of instructions for a graphics processor module."  Applicant respectfully disagrees.

17. The Concise Oxford Dictionary (sixth edition, 1976) defines the verb intercept as, "Seize, catch, stop on the way from place to place." Levoy does not teach nor hint that instructions have been seized on their way from place to place.
The Office on the other hand, asserts that Levoy intercepts the alleged "first set of instructions" simply by virtue of the fact that Levoy's alleged "second set of instructions" fail to contain certain features that are found in the "first set of instructions".  The applicant submits that this impermissibly extends the meaning of the term 'intercept' even when given the broadest reasonable interpretation. Applicant submits that merely because one set of instructions does not contain

instructions found in another set does not mean that the first set had been intercepted, even if the second set had originated from the first set.

18. A key requirement of Levoy is that the remote client device must generate the same "low quality rendering" as is generated on the server (Abstract, section 2 of page 1, and elsewhere). Thus under Levoy the instruction generating programs have been designed and written from the outset to accommodate the Levoy method. Levoy does not teach nor hint intercepting one set of instructions as such interception is superfluous and unnecessary. Applicant submits that the skilled in the art would not consider interception as disclosed, needed or obviously derived from the Levoy teachings.
On the other hand, the ability to intercept original software instructions and derive a second set therefrom allows the present invention to transparently use most graphics producing software, without requiring special accommodations therefrom. The present application teaches several methods of accomplishing such intercept (see, by way of example, paragraphs 63-65, 120, and 184) and this capability is a unique feature of the present invention, as claimed.

19. Thus applicant respectfully submits that the Levoy reference fails to teach the claimed step of intercepting of claim 1 or the instruction interceptor of claim 17. As a key claimed element is missing from the cited references, the rejection of those claims and their dependent claims is improper.

**Summary**

20. Applicant respectfully submits that the arguments used to support claim 1 are equally applicable to claim 17 whereby 17b specifies that the first graphics data must comprise of image frames and 17e specifies that the compressed video data signal is generated from the first graphics data. Similarly, the step of interception is performed by the claimed instruction interceptor, missing from cited art. Claims 18 and 20 are dependent on claim 17 and therefore the applicant submits that these are also distinguishable over the art made of record.

21. Applicant further respectfully submits that, in view of the discussion regarding independent claims 1, and 17, the claims are allowable in view of the prior art made of record. It is well established that claims dependent from allowable

claims are themselves allowable. Thus applicant respectfully submits that all claims pending in the application are allowable.

22. In light of the showing and all other reasons stated above, applicant believes that the rejections presented by the Examiner in the office action mailed to applicant on 22 January 2009 were overcome. Reconsideration and withdrawal of the rejection and issue of a notice of allowance on all pending claims is respectfully solicited.

23. Applicant has made a good faith effort to address each and every point made by the Examiner. Should the Examiner find any deficiency in the application, or should the Examiner believe for any reason, that a conversation with applicant's agent may further the allowance and issuance of this application, the Examiner is kindly requested to contact Shalom Wertsberger at telephone (207) 799-9733.

Respectfully submitted

/Shalom Wertsberger, Reg # 43,359/

<u>Shalom Wertsberger</u>
Reg. Num 43,359
30 Fern Lane
South Portland, ME 04106
Phone: (207) 799-9733
Fax: (207) 767-5324
Agent for Applicant