UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

T5.2 LTD.,

               Plaintiff,

v.

CITRIX SYSTEMS, INC.,

               Defendant.

CASE NO.: 24-CV-62093-EA/PAB

**<u>DECLARATION OF DR. OMID E. KIA REGARDING CLAIM CONSTRUCTION</u>**

**Table of Contents**

I.      INTRODUCTION ................................................................................................ 3

II.     BACKGROUND AND QUALIFICATIONS .................................................... 3

III.    APPLICABLE LEGAL STANDARDS ............................................................ 7

IV.     LEVEL OF ORDINARY SKILL IN THE ART ............................................. 11

V.      OPINIONS ON DISPUTED TERMS .............................................................. 13

    A.    "an instruction interceptor capable of intercepting a first set of instructions for said graphics processor module, said first set of instructions relating to how to render image frames, and generating an output comprising a second set of instructions for said graphics processor module" .................................................................................................... 13

    B.    "a processing function capable of processing said first set of instructions or said second set of instructions or a combination thereof in said graphics processor module, said processing function having an output capable of generating first graphics data, said first graphics data comprising image frames" ................................................................................ 16

    C.    "a processing function capable of processing said second set of instructions in said graphics processor module, said processing function being further capable of producing an output comprising second graphics data" ...................................................................... 19

    D.    "a compression assistance data generator capable of receiving an input comprising said second graphics data and producing an output comprising compression assistance data" ....... 21

    E.    "an instruction interception module" ..................................................................... 23

    F.    "graphics instruction modification module (GIMM)" ........................................... 24

    G.    "transmission module" .......................................................................................... 26

    H.    "wherein handshake signalling is provided between the encoder and at least one other step"   27

    I.    "wherein the step of identifying an attribute comprises at least one step selected from a group consisting of identifying the type of one of the outputted graphics instructions, identifying the contents of one of the outputted graphics instructions and any combination thereof" ............................................................................................................................ 29

    J.    "said different graphics texture instructions define at least one texture attribute which is arranged to be substantially unique to an area within an image frame in the second graphics data" .................................................................................................................................. 30

## I.      INTRODUCTION

1.      My name is Omid E. Kia, and I have been retained by counsel for Citrix Systems, Inc. ("Citrix") to analyze U.S. Patent Nos. 7,916,147 ("the '147 patent"), 8,081,192 ("the '192 patent"), 8,203,568 ("the '568 patent"), 8,466,922 ("the '922 patent"), 9,113,146 ("the '146 patent"), 9,117,285 ("the '285 patent"), 9,424,621 ("the '632 patent"), and 9,852,490 ("the '490 patent") (collectively, the "Asserted Patents") and to provide certain opinions regarding its claims.

2.      My opinions are based on my review of the intrinsic record of the Asserted Patents, the documents cited in this Declaration, state-of-the-art references at the priority dates of each patent, and my experience as detailed in this Declaration and my CV.

3.      I am being compensated at a rate of $500 per hour for time spent on this matter. I am also being reimbursed for expenses that I incur during the course of this work. My compensation is not contingent upon the substance of my opinions set forth herein or the outcome of this litigation.

## II.     BACKGROUND AND QUALIFICATIONS

4.      I have summarized my educational background, career history, and other relevant qualifications in this section. My qualifications, publications, professional experience, and expertise are set forth more fully in my curriculum vitae, attached as Exhibit 1.

5.      For my educational background, I earned my Bachelors of Science in electrical engineering from Catholic University America in 1987. I completed my Masters of Science in electrical engineering from the University of Illinois at Chicago in 1989. I then attended the University of Maryland, where I earned my Ph.D. in electrical engineering in 1997. My Ph.D. thesis topic was on document image compression and analysis.

6.      A chief focus of my career has been designing and developing computer imaging and graphics systems. My experience in this space spans industry and academia. For example, after I completed my Ph.D., I worked as an Electronics Engineer (Research Scientist) at the National Institute of Standards and Technology, where I worked on various projects including document image processing, large image-browsing, multimedia compression, and communication.

7.      I then took the position of Chief Technical Officer at IMACOM in 1999. In this role, I managed a team of engineers in developing medical imaging software and hardware. On the software side of this work, my role involved creating custom software applications and integrating custom graphical user interfaces to meet customer demands with varying degrees of customization. Among other things, my role involved the development of video pipeline processing, real-time storage and retrieval of live video, creating custom software applications, and integrating custom graphical user interfaces to meet customer demands. For example, I have developed algorithms with user-tunable features used for mobile devices and workstations where the user can exploit the underlying information by interacting with the user interface. I worked on improving image processing capabilities and compression.

8.      I left IMACOM in 2001 and have spent much of the last 20 years consulting in the computer graphics space, with a heavy focus on software applications and hardware utilization, including graphical user interfaces for visualization and hardware control. For example, in my role as President and Principal Consultant at Sigma Vision from 2000 to 2002, I was responsible for the full software and hardware development cycle, including user interface and inter-node communication design, for imaging products. Similarly, in my role as Chief Scientist at Imaging Sciences International from 2004 to 2009, I managed all technical directives

falling under digital imaging, including the software user interface development for various medical imaging products such as navigation of scan acquisition and three-dimensional data visualizations. I also led the digital hardware development for precision electronic control and inter-node communication. From 2009 to 2011, I worked at ITT Space Systems Division. As a senior staff scientist there, I served as the lead scientist in all technical activities including space situational awareness, 3D scene modeling, persistence surveillance, super-resolution (for lidar systems), scale space compression (for lidar systems), and space weather efforts. I also led the Compression Cell, which creates, motivates, and organizes current and ongoing capabilities in compression including image, video, volumetric, and other data modes within the Space System Division group. Subsequently, from 2011 to 2013, I held roles of chief engineer and principal scientist at ITT Exelis, Space Systems Division, where I worked on a large array of image and signal processing problems. From 2013 to 2017, I was the Chief Image Scientist at Northstrat, Inc., where I served as a subject matter expert in the areas of video processing, compression, and standards.

9.     Today, I maintain an active consulting practice with Coastal Communication Consultants Inc., where I provide subject matter expertise on all aspects of software development, design, and implementation as it pertains to image-based analysis.

10.     In my role as a technical leader in medical and other diagnostic imaging devices, I designed and developed a number of imaging systems with functionality that were fine tuned for a specific workflow to alleviate the user from making manual selections and which were either applied automatically, using user workflow, or with physical interfaces (e.g., via foot pedals, etc.). Most of my work has revolved around very specific algorithms that can exploit or tease out certain elements of what is being visualized and controlled. Thus, many of the interfaces that I

have created have utilized innovative techniques for exploitation of data that goes beyond simple control interfaces. All of these development efforts required analysis of the user workflow with imaging requirements to implement a context dependent processing flow from different sources, processing and visualization nodes. I also developed a variety of graphical image overlays in a distributed environment for various purposes such as textual and graphical annotations, measurements (point, linear and volume measurements), targeting, temporal processing, and highlighting of hidden features. My various experiences designing and developing distributed graphical systems included utilization of content data such as video, audio, data, and multimedia.

11.     In these capacities, I have worked on many aspects of video and content systems, including algorithm development, software development, hardware development, networking architecture, and system design. I have also implemented video processing baselines for various products including performance criteria such as video quality, processing, and communication requirements.

12.     My experience includes design and development of systems for video and content processing and communication, among many other concepts, including Video over IP, video surveillance, storage and processing of real-time live video, multimedia compression and communication, and image and video indexing. For example, after I completed my Ph.D., I worked as an Electronics Engineer at the National Institute of Standard and Technology, where I performed research and development on various projects involving multimedia compression and communication and video indexing using media processing tools to develop new and innovative techniques for archiving, processing, and transmitting video and other media. I also researched techniques for serving large microscope images annotated with educational pointers for educational purposes and served as the U.S. Ambassador to the MPEG standardization Group

working on the standards for MPEG-4 at the time. As another example, while working as a principal consultant for Sigma Vision, I authored several proposals directed to Video over IP and video surveillance systems, including development of Video over IP systems for thin clients that were java enabled. Later on, as President of Sigma Vision, I also performed several large-scale consulting projects in the area of Video over IP.

## III.    APPLICABLE LEGAL STANDARDS

13.     Within this statement, I apply my understanding of certain legal standards to opine on the scope and meaning of certain disputed claim terms. However, I am neither a lawyer nor an expert in patent law. The following is my understanding of these legal standards.

14.     I understand that claim construction is for the Court to decide.

15.     I understand that the patent claims are the numbered sentences at the end of each patent and define what a patent covers. The figures and text in the rest of the patent provide a description and/or examples of the prior art or the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage. Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than another claim. Therefore, what a patent covers depends, in turn, on what each of its claims covers.

16.     I understand that the words of a claim are generally given the ordinary and customary meaning that the term would have to a person of ordinary skill in the art at the time of invention. Because a claim is interpreted according to its meaning to a person of ordinary skill in the art, the knowledge, education, and experience of that person are also relevant to determining the scope and meaning of a patent claim.

17.     I understand that, in construing terms, Courts look first to the intrinsic evidence of record, which includes the patent itself (including the claims and specification) and the prosecution history. I also understand that Courts may consider extrinsic evidence, such as expert

and inventor testimony, dictionaries, and learned treatises, though Courts should consider the intrinsic record first.

18.     I understand that intrinsic evidence includes the prosecution history of a patent. The prosecution history of a patent provides the record of the examination of a patent application before the U.S. Patent and Trademark Office ("PTO"). The prosecution history provides evidence of how the patent examiner and the inventor understood the patent application and the claims, and can therefore be instructive on how to interpret the claims. It is my understanding that arguments or amendments made concerning one patent application can be instructive as to the meaning of like terms in another related patent application.

19.     I understand that particular embodiments appearing in the written description should not be used to limit claim language that has broader effect. I understand that even where a patent describes only a single embodiment, claims are not to be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.

20.     I understand that a person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which it appears, but also in the context of the entire patent, including the specification, the other claims, and the prosecution history.

21.     I understand that while claim terms are understood in light of the specification, the scope of the claims is not necessarily limited to inventions that look like the ones shown in the figures and described in the specification. I realize that limiting claims from the specification is generally not permitted absent a clear disclosure that the patentee intended the claims to be limited as shown.

22.     I understand that the claims in an issued U.S. patent are presumed valid, but that this presumption can be rebutted if it is shown by clear and convincing evidence that the patent claim is invalid.

23.     When assessing whether a claim phrase is definite, I understand courts must take into account the inherent limitations of language in often not providing absolute certainty. At the same time, a patent must be precise enough to afford clear notice of what is claimed in order to appraise the public of what remains available. I understand that the degree of precision necessary for adequate claims is a function of the nature of the subject matter, and that absolute precision is not required.

24.     I understand that indefiniteness is an invalidity defense, and that a defendant bears the burden to demonstrate a term is indefinite by clear and convincing evidence. I further understand that indefiniteness is a legal question with underlying factual determinations.

25.     I understand that a claim is indefinite if, when read in light of the specification and the prosecution history, it fails to inform, with reasonable certainty, persons of ordinary skill in the art about the scope of the invention.

26.     I understand that if the meaning of the claim cannot be reasonably understood by a person of ordinary skill in the art when read in light of the specification and the prosecution history, the claim is indefinite.

27.     I also understand that a claim is indefinite if it is unclear or ambiguous as to what previous claim term a subsequent claim term references. For example, I understand that if two different elements, such as two different levers, are recited in a claim, and a subsequent claim element recites "the lever," that claim is indefinite if it is unclear or ambiguous as to which of the two levers the term "the lever" references.

28.     I understand that "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. §112 ¶ 6.

29.     I understand that 35 U.S.C. §112 ¶ 6 gives patent applicants two options: (1) recite, in the claim, a function without reciting structure for performing the function and limit the claims to the structure, materials, or acts disclosed in the specification (or their equivalents), in which case § 112 ¶ 6 applies, or (2) recite both a function and the structure for performing that function in the claim, in which case § 112 ¶ 6 is inapplicable. I understand that limitations that invoke § 112 ¶ 6 are generally known as "means-plus-function" limitations.

30.     I understand that the overall means-plus-function analysis is a two-step process. The first step is to determine whether a claim limitation is drafted in means-plus-function format, which requires courts to construe the limitation to determine whether it connotes sufficiently definite structure to a person of ordinary skill in the art. If the limitation connotes sufficiently definite structure, it is not drafted in means-plus-function format, and 35 U.S.C. § 112 ¶ 6 does not apply. If, however, courts conclude that the limitation is in means-plus-function format, they perform the second step of determining what structure, if any, disclosed in the specification corresponds to the claimed function.

31.     I understand that courts presume at the first step of the analysis that a claim limitation is subject to § 112 ¶ 6 when the claim language includes the term "means." I understand that the inverse is also true—courts presume that a claim limitation is not drafted in means-plus-function format in the absence of the term "means." I also understand, however, that this presumption is rebuttable. The presumption can be overcome if a challenger demonstrates

that the claim term fails to recite sufficiently definite structure. Nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word means, and can invoke § 112 ¶ 6. I understand the essential inquiry is not merely the presence or absence of the word "means," but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.

32.     I understand that construction of a means-plus-function limitation includes two steps. First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs the function. I understand that a structure disclosed in the specification qualifies as a corresponding structure if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim. I understand that when the specification fails to identify sufficient structure for performing the claimed function, the means-plus-function limitation lacks any discernible scope, and the claim is invalid for indefiniteness.

33.     I understand that in a means-plus-function claim in which the disclosed structure is a computer or microprocessor programmed to carry out an algorithm, the disclosed structure is a special purpose computer programmed to perform the disclosed algorithm. I understand that in the case of such computer-implemented functions, it is required that the specification disclose an algorithm for performing the claimed function. I understand that the specification can express the algorithm in any understandable terms including as a mathematical formula, in prose, as a flow chart, or in any other manner that provides sufficient structure.

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

34.     I understand that claim interpretation is from the perspective of a person of ordinary skill in the art at the time of the invention ("POSITA").

35.     The '147 patent was the first of the asserted patents to be filed, with an international application filed on March 3, 2003. '147 patent at Cover. The remaining seven asserted patents are each continuation applications, which claim priority, directly or by way of one or more additional continuation applications, to the '147 patent.  I understand that Plaintiff T5.2  Ltd. is taking the position that the asserted claims of the Asserted Patents are entitled to a priority date earlier than the March 3, 2003, filing date, specifically July 2, 2001. I understand that Citrix's position is that the priority date is March 3, 2003, or later.  For the purposes of this declaration the dispute over the priority date does not have a substantive effect on my opinions as there was not a substantial difference between the skill level of a POSITA in 2001 versus 2003, with respect to the technology field of the Asserted Patents.

36.     In my opinion, a POSITA would have had a bachelor's degree in computer science or electrical engineering, or equivalent training, and approximately two years of practical experience in designing and/or programming systems for image/graphics processing and compression.

37.     I am very familiar with the skill level and capabilities of a person of ordinary skill in the art of the Asserted Patents in 2001 - 2003.  For example, at the time, I worked with people of that skill level in my role as a technical leader in imaging for graphics, capture, processing, compression, and display in a variety of fields including medical and other diagnostic imaging devices.   In particular with relevance to the technical field of the '147 patent and its continuations, my experience traversed use of graphical displays to render live moving images, process live images, capture images and video, and interface with peripheral components. In doing so, throughout the period extending from the mid 1990's to late 2000's, I worked on a number of projects that required balancing of process and communication speeds associated with

graphical displays to enable imaging functionalities.  In this capacity, I mentored a number of junior colleagues with the skill level of a POSITA, and I have direct knowledge and experience with the specified level of technical knowledge and experience.

## V.    OPINIONS ON DISPUTED TERMS

38.    I have been asked to provide opinions as to the terms and issues identified below and the claims associated with those terms.

### A.    "an instruction interceptor capable of intercepting a first set of instructions for said graphics processor module, said first set of instructions relating to how to render image frames, and generating an output comprising a second set of instructions for said graphics processor module"

39.    In my opinion, in the viewpoint of a POSITA in the 2003 timeframe, the term "instruction interceptor" would not have connoted any known structure.  The term was not a term that was used in the field at the time to designate a specific structure.

40.    I am not aware of any evidence of the usage of "instruction interceptor" in common parlance or by persons of ordinary skill in the art to designate structure.

41.    Additionally, the '147 patent does not use or define the term "interceptor."  *See* '147 patent.  The function of intercepting instructions is described as performed by an "instruction interception module" or "instruction interception function."  *See* '147 patent at Abstract, 3:61-64, 5:8-16, 6:37-39, 9:1-15, 9:59-61, 10:1-6, 10:26-28,10:34-36, 10:57-59, 13:21-24, 15:49-53, Fig. 6.  Thus, "instruction interceptor" appears to be a term coined for the purposes of the '147 patent.

42.    The functions performed by the claimed "instruction interceptor" are indicated by the phrase "capable of" in claim 21, *i.e.* "intercepting a first set of instructions for said graphics processor module, said first set of instructions relating to how to render image frames, and

generating an output comprising a second set of instructions for said graphics processor module."
'147 patent at claim 21.

43.    I understand that a structure disclosed in the specification qualifies as a corresponding structure if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim.

44.    The specification discloses several structures that perform these recited functions. The specification discloses that the "instruction interception function may be a device driver" or "a wrapper component for DirectX™ or OpenGL™." '147 patent at 5:8-10. Elsewhere, the specification describes other software or hardware performing the instruction interception functions. *Id.* at 9:8-12 ("the instruction interception module is an addition to existing middleware, such as DirectX™ or OpenGL™"); 15:51-53 ("instruction interception module 74, which may be embodied as a software wrapper or hardware form."). Based at least on these disclosures, the specification describes the claimed instruction interceptor as a device driver, DirectX wrapper function or other software or hardware.

45.    I understand that for a computer-implemented means-plus-function term, such as the claimed "instruction interceptor," the corresponding structure also includes the algorithm disclosed in the specification for performing the claimed function.

46.    In my opinion, the specification discloses three algorithms for performing the claimed functions.

47.    First, FIG. 1 depicts two graphics processors, a main graphics processor and a subsidiary graphics processor. The '147 patent describes how the graphics instructions are input to these graphics processors in col. 9:1-18 and col. 10:1-16. In this embodiment, the instruction interception module performs the recited function by (1) receiving first instructions, which

include "3D scene instructions," intended for the main graphics processor, and (2) generating

second instructions which include "the same 3D scene instructions . . . but with the lighting and

shading aspects turned off or altered so as to minimize alterations of the textures in a scene." *Id.*

at 10:1-7. Specifically, the second instructions include instructions to render each shape using "a

unique flat colour," or with "an aspect of the colour that makes it unique, such as by using a

preset bit-range of the textures/colours to uniquely identify an object." *Id.* at 10:6-16.



**Fig. 1**

48.    Second, the '147 patent describes an algorithm in which the instruction

interception module generates a second set of instructions which cause the subsidiary graphics

processor to generate new object textures. *Id.* at 13:21-34.  This second set of instructions is

described as causing the subsidiary graphics processor to (1) "generate a single texture that

covers the entire image frame and binds to the surfaces of the objects in said image frame to

produce new textures," and (2) project onto or reflect the single texture on the image frame.  *Id.*

at 13:25-32.

49.    Third, Fig. 6 of the '147 patent depicts two graphics processing units, GPU1 and

GPU2, receiving inputs from an instruction interception module.  The instruction interception

module performs the recited functions by (1) intercepting instructions generated by a CPU, (2)

passing a first set of instructions, including vertex data, transformation data, and texture data to

GPU1, (3) generating a second set of instructions, which are a "specially manipulated version" of

the first set of instructions, and (4) inputting the second set of instructions to GPU2 which

generates compression assistance data. *Id.* at 15:49-61.



Fig. 6

**B.**     **"a processing function capable of processing said first set of instructions or said second set of instructions or a combination thereof in said graphics processor module, said processing function having an output capable of generating first graphics data, said first graphics data comprising image frames"**

50.     In my opinion, in the viewpoint of a POSITA in the 2003 timeframe, the term "a

processing function" would not have connoted sufficiently definite structure to a person of

ordinary skill in the art.

51.     For example, "processing function" would not have had a well understood

structural meaning in the field in the 2003 timeframe. Instead, as recited in the claims, it simply

refers to a function performed by software, *i.e.* processing a function.  In this case, the function

processed is "capable of processing said first set of instructions or said second set of instructions or a combination thereof in said graphics processor module, said processing function having an output capable of generating first graphics data, said first graphics data comprising image frames."

52.     I am not aware of any evidence of the usage of "processing function" in common parlance or by persons of ordinary skill in the art to designate a structure.

53.     I understand that the parties agree that the term "graphics processor module," means "one or more GPUs [graphics processing units]."  In my opinion, the claimed "processing function" is a generic term for software that performs the recited function.  Claim 21 supports this view as the "processing function" must be "<u>capable of processing</u> said first set of instructions or said second set of instructions or a combination thereof in <u>said graphics processor module</u>…." '147 patent, claim 21.

54.     There is no indication in the claims or the specification that the claimed "processing function" refers to any definite structure or any existing prior art software. '147 patent, *passim*. Simply adding "processing" before the word "function" does not add structure to the function.  Instead, it simply describes what any software does, which is process instructions.

55.     The specification discloses three algorithms for performing the claimed function.

56.     First, Fig. 3 of the '147 patent depicts "a typical processing flow of rendering a scene by a graphics processor." '147 patent at 9:40-45. As shown, the algorithm for processing a set of instructions to generate graphics data includes the steps of (1) "transformation," (2) "lighting," (3) "setup and clipping" and (4) "rendering." *Id.*



**Fig. 3**

57.     Second, Fig. 6 depicts two GPUs processing instructions from the instruction interception module. '147 patent at 15:53-64. The algorithm described in relation to Fig. 6 includes (1) providing a first set of instructions to the first GPU, which renders the first instructions "as the game intended," (2) providing a "specially manipulated version of the instructions" to the second GPU which outputs compression assistance data based on the second instructions, (3) dividing each image frame rendered by the first GPU into blocks of pixels, and (4) finding, if possible, the x,y coordinates in the previous image frame for each block of pixels. *Id.*

58.     Third, the specification describes algorithms which are depicted in Figs. 7-10 and involve the use of a vertex shader program in a GPU. *Id.* at 17:19-18:26. The specification describes the flowcharts of Figs. 8, 9, and 10 as processing instructions to generate image data. *Id.* at 17:31-36 (describing steps of Fig. 8); 17:37-57 (describing steps of Fig. 9); 17:58-18:26 (describing steps of Fig. 10). The determination of which inputs and instructions in the VS program are used to calculate the new positions of the vertices is based on the "screenspace" position of the vertex, represented by the output "oPos." *Id.* at 17:28-31.

C.    **"a processing function capable of processing said second set of instructions in said graphics processor module, said processing function being further capable of producing an output comprising second graphics data"**

59.    In my opinion, in the viewpoint of a POSITA in the 2003 timeframe, the term "a processing function" would not have connoted sufficiently definite structure to a person of ordinary skill in the art.

60.    For example, "processing function" would not have had a well understood structural meaning in the field at the time. Instead, as recited in the claims, it simply refers to a function performed by software, *i.e.* processing a function.  In this case, the function processed is "capable of processing said second set of instructions in said graphics processor module, said processing function being further capable of producing an output comprising second graphics data."

61.    I am not aware of any evidence of the usage of "processing function" in common parlance or by persons of ordinary skill in the art to designate structure.

62.    I understand that the parties agree that the term "graphics processor module," means "one or more GPUs [graphics processing units]."  In my opinion, the claimed "processing function" is simply a generic term for software that performs the recited function. Claim 21 supports this view as the "processing function" must be "<u>capable of processing</u> said second set of instructions in <u>said graphics processor module</u>…." '147 patent, claim 21.

63.    There is no indication in the claims or the specification that the claimed "processing function" refers to any definite structure or any existing prior art software. '147 patent, *passim*. Simply adding "processing" before the word "function" does not add structure to the function.  Instead, it simply describes what any software does, which is process instructions.

64.    The specification discloses five algorithms which it clearly links to the recited functions.

65.     First, Fig. 1 of the '147 patent depicts a main graphics processor and a subsidiary graphics processor. '147 patent at 9:61-66, 10:1-16.  The algorithm described in the specification processes a second set of instructions to generate graphics data by (1) processing 3D scene instructions with the lighting and shading turned off or altered and (2) rendering a shape using either a unique flat color or a color with an aspect that makes it unique to the corresponding object. *Id.*

66.     Second, the specification describes an algorithm which coats each object with a new texture by (1) generating a texture by allocating bits of a pixel to include information having a unique code for the object, transparency, variation of the texture in the x axis, and variation of the texture in the y axis, and (2) applying the generated texture to each of the 3D objects in the scene. *Id.* at 11:21-63.

67.     Third, the specification describes an algorithm for applying "a single screen-sized texture" to all objects. This algorithm includes (1) determining a "projection matrix," (2) projecting a single screen-sized texture onto the scene, and (3) blending the projected texture with the blank surfaces of each object in a scene. *Id.* at 12:35-45, 12:48-54.

68.     Fourth, Fig. 6 depicts two GPUs which receive instructions from an instruction interception module.  '147 patent at 15:53-64.  The algorithm related to Fig. 6 includes (1) providing a first set of instructions to GPU1 which renders the instructions "as the game intended," (2) providing a "specially manipulated version of the instructions" to GPU2 which outputs compression assistance data based on the second instructions, (3) dividing each image frame into blocks of pixels, and (4) finding, if possible, the x,y coordinates in the previous image frame for each block of pixels . *Id.*

69.     Fifth, Figs. 9-10 depict an algorithm using a vertex shader program in a GPU.  *Id.* at 17:46-18:17. The specification describes the flowcharts of Figs. 9-10 as processing instructions to generate image data.  *Id.* at 17:46-57 (describing steps of Fig. 9 flowchart); 17:58-18:26 (describing steps of Fig. 10 flowchart).  The determination of which inputs and instructions in the VS program are used to calculate the new positions of the vertices is based on the "screenspace" position of the vertex, represented by the output "oPos."  *Id.* at 17:28-31.

**D.     "a compression assistance data generator capable of receiving an input comprising said second graphics data and producing an output comprising compression assistance data"**

70.     In my opinion, in the viewpoint of a POSITA in the 2003 timeframe, the term "generator" would not have connoted sufficiently definite structure to a person of ordinary skill in the art.

71.     For example, "generator" would not have had a well understood structural meaning in the field at the time. Instead, as recited in the claims, it simply refers to a function performed by software, *i.e.* generating compression assistance data.

72.     I am not aware of any evidence of the usage of "generator" in common parlance or by persons of ordinary skill in the art to designate structure.

73.     The '147 patent does not use or define the term "compression assistance data generator." '147 patent. Instead, the '147 patent generically describes software that performs the function of generating compression assistance data.  *See, e.g.*, *id.* at 3:52-53 ("processing said second graphics data to generate compression assistance data…"), 4:3-4 (same), 7:14-17 ("Preferably, the assistance data generating function is adapted to generate a motion vector…"), 7:20-25 (same). There is no definite structure or existing prior art software in the '147 patent that is described as being the claimed "compression assistance data generator." Thus, in my opinion, a "compression assistance data generator" appears to be a term coined for the purposes of the

'147 patent, and the claimed "compression assistance data generator" is simply a generic term, referring to any software for implementing the claimed function.

74.     The functions recited by this claim limitation are: "receiving an input comprising said second graphics data and producing an output comprising compression assistance data." '147 patent at claim 21.

75.     As stated above, I understand that a structure disclosed in the specification qualifies as a corresponding structure if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim. I also understand that for a computer-implemented means-plus-function term, such as the claimed "compression assistance data generator," the corresponding structure also includes the algorithm disclosed in the specification for performing the claimed function.

76.     Here, the specification discloses four such algorithms.

77.     First, the specification describes an algorithm for generating compression assistance data which includes (1) calculating motion vectors of each block in an image and (2) determining a motion vector for at least a part of each object. '147 patent at 9:59-61, 11:64-12:34.

78.     Second, the specification describes an algorithm which includes (1) determining a "projection matrix," (2) projecting a single screen-sized texture onto a scene, (3) blending the projected texture with blank surfaces of all the objects in the scene, (4) moving the scene, (5) resetting the scene by removing the projected texture, and (6) re-projecting the texture. *Id.* at 12:35-47, 12:55-13:20.

79.     Third, the specification describes an algorithm which includes (1) allocating a texture to store a screen position of an object across its surfaces in a "texture cache," (2)

identifying where on the screen each texel would appear in the original image, and (3) determining a motion vector based on the identification.  *Id.* at 14:4-15:2.

80.     Fourth, Fig. 6 of the '147 patent depicts two GPUs which receive instructions from an instruction interception module.  '147 patent at 15:53-64.  The algorithm related to Fig. 6 includes (1) providing a "specially manipulated version of the instructions" to GPU2 which outputs compression assistance data based on the second instructions, (2) dividing each image frame into blocks of pixels, and (3) finding, if possible, the x,y coordinates in the previous image frame for each block of pixels.  *Id.*

### E.     "an instruction interception module"

81.     In my opinion, in the viewpoint of a POSITA in the 2003 timeframe, the term "an instruction interception module" would not have connoted sufficiently definite structure to a person of ordinary skill in the art.

82.     For example, "an instruction interception module" would not have had a well understood structural meaning in the field at the time. Instead, as recited in the claims, it simply refers to a function performed by software, *i.e.* intercepting an instruction.

83.     I am not aware of any evidence of the usage of "instruction interception module" in common parlance or by persons of ordinary skill in the art to designate structure.

84.     Merely using the term "module" does not provide any indication of structure. Further, neither the claim nor the specification discloses any particular software or application for performing the claimed function. The '147 patent fails to disclose a definite structure when describing an "instruction interception module" or "instruction interception function." *Id.* at Abstract, 3:61-64, 5:8-16, 6:37-39, 9:1-15, 9:59-61, 10:1-6, 10:26-28,10:34-36, 10:57-59, 13:21-24, 15:49-53, Fig. 6. Additionally, the phrase "instruction interception" does not add structure to

the module. Instead, the phrase "instruction interception" describes what the "instruction interception module" does, which is intercept instructions, without describing what it is.

85.     In my opinion, the structure disclosed for performing this "instruction interception" function is the same as that disclosed for the "instruction interceptor," discussed above. '147 patent at 5:8-9, 5:9-10, 9:8-12, 15:53 and describing algorithms set forth at (1) 9:1-18 and 10:1-16, (2) 13:21-34, and (3) 15:49-61.

F.     "graphics instruction modification module (GIMM)"

86.     In my opinion, in the viewpoint of a POSITA in the 2003 timeframe, the term "graphics instruction modification module (GIMM)" would not have connoted sufficiently definite structure to a person of ordinary skill in the art.

87.     For example, "graphics instruction modification module (GIMM)" would not have had a well understood structural meaning in the field at the time. Instead, as recited in the claims, it simply refers to a function performed by software, *i.e.* modifying graphics instructions.

88.     I am not aware of any evidence of the usage of "graphics instruction modification module" or "GIMM" in common parlance or by persons of ordinary skill in the art to designate structure.

89.     Like the prior term, merely using the term "module" does not provide any indication of structure.  Neither the claims nor the specification discloses any particular software for performing the claimed function of modifying instructions.  Additionally, the phrase "graphics instruction modification" does not describe what the module is. Instead, it merely describes what the "graphics instruction modification" does, which is modifying graphics instructions.

90.     The specification discloses five algorithms which it clearly links to the recited function of modifying graphics instructions.

91.     First, the '147 patent describes an algorithm for modifying instructions which includes (1) processing 3D scene instructions with lighting and shading aspects turned off or altered and (2) rendering a shape using either a unique flat color or a color with an aspect that makes it unique to the corresponding object.  '147 patent at 10:1-16.

92.     Second, the specification describes an algorithm that includes (1) generating a texture by allocating bits of each pixel to include information comprising a unique code for the object, transparency, variation of the texture in the x axis, and variation of the texture in the y axis and (2) coating each of the 3D objects in the scene with the generated texture.  *Id.* at 11:21-63.

93.     Third, the specification describes an algorithm which includes (1) determining a "projection matrix," (2) projecting a single screen-sized texture onto a scene, and (3) blending the projected texture with blank surfaces of all the objects in the scene.  *Id.* at 12:35-45, 12:48-54.

94.     Fourth, the specification describes an algorithm which includes (1) a second GPU extracting compression assistance data from a "specially manipulated version of the [first] instructions," (2) dividing each image frame into blocks of pixels, and (3) finding, if possible, the x,y coordinates in the previous image frame for each block of pixels.  *Id.* at 15:53-61.

95.     Fifth, Figs. 9-10 of the '147 patent depict algorithms that include the use of a vertex shader program in the GPU.  *Id.* at 17:46-18:17. The specification describes the flowcharts of Figs. 9-10 as including instruction modification.  *Id.* at 17:46-57 (describing steps of Fig. 9 flowchart); 17:58-18:26 (describing steps of Fig. 10 flowchart).  The determination of which inputs and instructions in the VS program are used to calculate the new positions of the

vertices is based on the "screenspace" position of the vertex, represented by the output "oPos." *Id.* at 17:28-31.

### G. "transmission module"

96.     In my opinion, in the viewpoint of a POSITA in the 2003 timeframe, the term "transmission module" would not have connoted sufficiently definite structure to a person of ordinary skill in the art.

97.     For example, "transmission module" would not have had a well understood structural meaning in the field at the time. Instead, as recited in the claims, it simply refers to a function performed by software, *i.e.* transmitting.  Just like the prior term, the use of "module" is a generic recitation of structure for providing a function.   Neither the claims nor the specification discloses any particular software for performing the claimed function of transmitting compressed image data.  And the prefix "transmission" simply describes what the "transmission module" does, *i.e.* transmitting, not what it is.

98.     I am not aware of any evidence of the usage of "transmission module" in common parlance or by persons of ordinary skill in the art to designate structure.

99.     The preambles of claims 1 and 11 both recite "[a] system for producing a compressed image data transmission." This recitation clearly indicates that the function of the transmission module is transmitting compressed image data. This aligns with the specification, which explains that "compressed video data 60" is transmitted "from the centralised servers 50 to the user terminals." '147 patent at 15:38-41. Further, "[t]he centralised servers and user stations are connected via one, or more, data communications networks 54, such as a cable or satellite broadcasting network and/or a public telephone network." *Id.* at 15:28-49. Based on this disclosure, the structure that corresponds to the claimed function is network interface 70, which

is an interface to a "data communication network[], such as a cable or satellite broadcasting network and/or a public telephone network." *Id.*

H. **"wherein handshake signalling is provided between the encoder and at least one other step"**

100. In my opinion, this term is indefinite because the claim language would have failed to inform a POSITA in the 2003 timeframe, with any certainty, about the scope of the invention in light of the specification and prosecution history.

101. Claims 9 and 17 of the '192 patent recite "wherein the generation of the compressed video data signal is facilitated by an encoder, and wherein handshake signalling is provided between the encoder and at least one other step." *See* '192 patent claims 9 and 17. Claims 9 and 17 depend from independent claims 1 and 14, respectively. Both claims refer back to the claims on which they depend.

102. A POSITA would have understood that a "handshake" is "[a] series of signals acknowledging that communication or the transfer of information can take place between computers or other devices." Microsoft Computer Dictionary, Fifth Ed. Further, "[a] hardware handshake is an exchange of signals over specific wires (other than the data wires) in which each device indicates its readiness to send or receive data" and "[a] software handshake consists of signals transmitted over the same wires used to transfer data, as in modem-to-modem communications over telephone lines." *Id.*

103. A POSITA would have further understood that an "encoder" of the '192 patent claims is a physical component of a processor that compresses video data into a standardized format. To be clear, an "encoder" by itself can mean other things, but with respect to the claims of the '198 patent, an encoder is clearly a video encoder.

104.    A POSITA would have therefore understood that the claim recites a handshake "between" an encoder and a "step."  However, in my opinion, it is indiscernible what the claim means by providing signaling between a physical component (an encoder) and a "step" of claim 1 or 14 respectively.

105.    The steps of claim 1, include the following:

a.      a) intercepting graphics instructions outputted by graphics generating software;

b.      b) analyzing the graphics instructions to determine which of the graphics instructions are useful for generation of compression assistance data;

c.      c) generating a second set of instructions responsive to the results of the analysis;

d.      d) processing the graphic instructions or at least a portion of the second set of instructions or a combination thereof, in the graphics processor module to generate graphics data comprising one or more image elements;

e.      e) processing at least a portion of the second set of instructions to generate compression assistance data; and,

f.      f) processing at least a portion of the graphics data using at least a portion of the compression assistance data to generate the compressed video data signal.

106.    The steps of claim 14, include the following:

a.      a) intercepting graphics instructions outputted by graphics generating software;

b.      b) providing a second set of instructions;

c.   c) processing the graphic instructions or at least a portion of the second set of instructions or a combination thereof, in the graphics processor module to generate graphics data comprising one or more image elements;

d.   d) processing at least a portion of the second set of instructions to analyze the graphics instructions and thereby produce compression assistance data; and,

e.   e) processing at least a portion of the graphics data using at least a portion of the compression assistance data to generate the compressed video data signal.

107.   In my opinion, it is indiscernible what the claim means by providing signaling between a physical component (an encoder) and any "step" of claim 1 or 14 listed above.  Each "step" in claims 1 and 14 is an individual action in a method claim that allegedly accomplishes a specific result.  Thus, a recitation of a physical component having a handshake with an individual action is indefinite.  For example, there cannot be a handshake between an encoder (a physical item) and a "processing" step generally.  As a further example, it is unclear how there can be a handshake between encoder and the "intercepting," "analyzing," or "generating" steps in claim 1 or the "intercepting" or "providing" steps in claim 14.

108.   As such, in my opinion, claims 9 and 17 of the '192 patent fail to inform a POSITA with reasonable certainty as to the scope of the claims and are therefore indefinite.

I.   **"wherein the step of identifying an attribute comprises at least one step selected from a group consisting of identifying the type of one of the outputted graphics instructions, identifying the contents of one of the outputted graphics instructions and any combination thereof"**

109.   In my opinion, this term is indefinite because the claim language fails to inform a POSITA with reasonable certainty about the scope of the invention in light of the specification

and prosecution history.  Specifically, in my opinion, each of dependent claims 26, 34, 37, and 41 claim recites "wherein the step of identifying an attribute," but none of the corresponding independent claims or intervening claims of the '146 patent recite a step of "identifying an attribute."  The word "attribute" does not appear anywhere in the claims or specification of the '146 patent except in the dependent claims referring back to "the" step of identifying an attribute. Therefore, these claims are referring back to a "step" that does not exist.

110.    Such reference shows that these dependent claims fail to inform a POSITA with reasonable certainty as to the scope of the claims, and are therefore indefinite.

**J.      "said different graphics texture instructions define at least one texture attribute which is arranged to be substantially unique to an area within an image frame in the second graphics data"**

111.    In my opinion, this term is indefinite because the claim language fails to inform a POSITA with reasonable certainty about the scope of the invention in light of the specification and prosecution history.  Specifically, in my opinion, the word "substantially" used here is a term of degree in relation to "substantially unique to an area."

112.    I understand from counsel that where a term of degree is used in a claim, the court must determine whether the patent provides some standard for measuring that degree. I further understand that the written description is key to determining whether a term of degree is indefinite.

113.    In my opinion, the specification is devoid of any standard that would allow a POSITA to determine whether a portion of an image is "substantially unique to an area." There is no indication of a method for measuring uniqueness to an area. Even if there was, the lack of guideposts in the claim for how to distinguish among varying degrees of uniqueness would still leave a POSITA uncertain as to the scope of the claims.

114.    Thus, in light of the lack of any objective standard in the specification to determine the scope of "substantially unique to an area," it is my opinion that this term is indefinite.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: November 4, 2025

_____
Omid E. Kia, Ph.D.

# Exhibit 01

**Omid E. Kia**
10813 Rock Run Drive, Potomac, MD 20854
omidkia@me.com
(240) 899-7333

## Expertise:

**Software:**   Full lifecycle software development as requirements management, solution architecture, implementation and testing. Large and small scale software development ranging from Enterprise class solution development to small embedded real time software development. Design and develop large array of algorithms for signal, image, video and content processing. Performance and algorithmic analysis of software components with strong mathematical basis.

**Hardware:** Large image/video-based hardware solutions with pipeline and microprocessor based system for simple and complex applications. Interface of high performance imaging components into a digital infrastructure at chip and camera level designs. Single board systems with high performance devices for time critical controls.

**Science:** Strong ability for analysis and understanding of all diagnostic imaging modalities such as all X-ray, Nuclear Medicine and Ultrasound imaging modalities in terms of energy source, detectors and intermediate processing. Proven record of introducing new concepts to existing problems using physical and mathematical models. Strong ability to analyze, design and develop signal/image/video/content processing algorithms and in particular develop various computed processing algorithms for demanding problems.

## Education:

### Ph.D. in Electrical Engineering
University of Maryland at College Park (UMCP), May 1997
Major Field of interest: Control and Communication theory
Thesis Topic: Document Image Compression and Analysis

### M.S. in Electrical Engineering
University of Illinois at Chicago (UIC), August 1989 G.P.A. 5.0/5.0
Major Field of Interest: Control theory and Automation
Master's Project: Streamlined Methodology for Digital Controller Design.

### B.S. in Electrical Engineering
Catholic University of America (CUA), May 1987, G.P.A. 4.0/4.0
Major Field of Interest: Computer Engineering and Control
Senior Design Project: Design and Implementation of an Underwater Dive Computer.

## Accomplishments:

**Chief Scientist,** Northstrat: Grew new science ventures while supporting customer contract on a full-time basis.
**Chief Engineer,** ITT Exelis: Grew the company footprint at the customer site by promoting technical solutions and demonstrating associated value.
**Principal Engineer,** ITT Exelis: Patented IP and grew initial project to a long term processing chain effort at customer site.

**Senior Scientist,** ITT Exelis: Patented IP in fields of LIDAR, FMV, Space Weather and Radars. Landed $1.5M project associated with only one pursuit.

**Chief Scientist,** Imaging Sciences: Grew the company from a $2M company to $145M and beyond with a revolutionary dental imaging machine.

**President,** Sigma Vision: Developed revolutionary x-ray imaging product for veterinary market that is currently supporting three separate companies worldwide.

## Experience:

**Subject Matter Expert,** Coastal Communication Consultants Inc., Manassas, VA September 2017 – Now. Serve as a subject matter expert in the general fields image science, data science, software development and transition to operational setting. Utilize classical estimation and detection theory techniques in conjunction with feature extraction and pattern analysis to derive effective data science algorithms. Also perform software development to integrate algorithms into existing and new systems. Interface with customer requirements by educating programmers and customers on the realm of possibilities with real demonstrable techniques. Also continue to serve as the subject matter expert in the areas of video processing, compression and standards for multiple contracts. Submitted responses to Request for Information and Proposals to area customers for imaging, image processing, remote sensing, content process, signal processing and related technology oriented solutions.

**Chief Image Scientist,** Northstrat Inc., Sterling, VA November 2013 – September 2017. Served as the chief image scientist and led research and development efforts with respect to all high technology development efforts. Served as the subject matter expert in the areas of video processing, compression and standards for multiple contracts. Submitted responses to Request for Information and Proposals to area customers for imaging, image processing, remote sensing, content process, signal processing and related technology oriented solutions. Support multiple programs as a subject matter expert as video processing, low light imaging, Lidar data processing, Synthetic aperture radar imaging and data fusion. Perform array of computer vision algorithms and physics-based signal processing and analysis. Utilized image science, signal processing, software development and engineering practices to bring multiple research concepts to an operational setting.

**Chief Engineer,** ITT Exelis, Space Systems Division, Herndon, VA October 2011 – November 2013. Served as the chief engineer and led technical efforts in an NRO program at the Washington Innovation Center. Developed technical solutions across a large array of image and signal processing problems. Contributed to ground breaking solutions and fundamental shifts in workflow utilizing expertise in mathematics, physics, software development, hardware exploitation, market demand and business partners. Routinely applied a multidisciplinary approach to complex problems.

**Principal Scientist,** ITT Exelis Space Systems Division, Herndon, VA September 2012 – November 2012. After initial research and development in LIDAR super resolution, was awarded a contract to implement and compare results with existing LIDAR super resolution algorithms. Lead a team of scientists to implement and expand on original concept and insert in existing processing chain. Delivered results that exceeded expectations and fundamentally identified shortcomings in the current process flow. Performed this project while serving as the Chief Engineer at an NRO program.

**Senior Staff Scientist,** ITT Space Systems Division, Herndon, VA June 2009 – October 2011. Serve as an expert in all pursuits pertaining to remote sensing, surveillance and image/signal processing problems. Primarily served as the lead scientist in all technical activities including space situational awareness, 3D scene modeling, persistence surveillance, super-resolution (for lidar systems), scale space compression (for lidar systems) and space weather efforts. Inventor in concepts leading to patent applications and pursuits. Leader of the Compression Cell, which creates, motivates and organizes current and ongoing capabilities in compression including image, video, volumetric and other data modes within the Space System Division group. Involved with efforts in building ideas matched to pursuits for Full Motion Video, Situational Awareness, Space Weather and several Surveillance initiatives as the primary scientist. Interests include volumetric processing, multi-mode image/data processing, radar processing, automatic target recognition, computational imaging,

2

compression and knowledge management which involves preliminary work for submittal into corporate and government channels for funding opportunities. These efforts require substantial knowledge of the current state of the art and fundamental understanding of strengths and weaknesses of prevailing methodologies in order to make a viable case for pursuit.

**Expert Consultant,** Part-time consulting, Jan 2002 – now.
Perform expert consulting for Intellectual Property and High Technology development. Intellectual property consulting in all areas of high technology and in particular, imaging, compression, encryption, standard based encoding, consumer devices, medical devices, patient management, embedded solutions and smart energy. Work involves expert analysis of portfolio holdings, analysis of potential infringers, licensing opportunities and litigation support. High technology development in areas of medical imaging, electrical health record, medical devices and smart energy devices have been pursued with inventions being pursued. Consult in dental imaging and in particular Cone Beam Computed Tomography and Podiatric Radiography. Perform consulting for law firms, patent analysis firms and high technology companies.

**Chief Scientist,** Imaging Sciences International, Inc. Hatfield, PA Jan 2004 – April 2009.
Chief Scientist and director of digital X-ray Development. Perform, direct and manage all technical directives falling under digital imaging including software development, hardware development, receptor development and various signal/image processing algorithms. As chief scientist I performed the first look at all 3rd party technology suggestions and assessed value for our product. These spanned technologies across software, hardware and physics based (primarily x-ray and visible light) solutions. Spearheaded a detector development effort which involved working with internal and external resources along with performance based selection of outside vendors. These detectors are designed to operate under very low light conditions and efficient manner. Served as the primary Intellectual Property Manager for all patent related work for Imaging Sciences and other sister companies, under the Danaher umbrella, dealing with imaging work. In this capacity I managed a group of scientists and lawyers to address all aspects of patent related issues including foreign filings, office action response, infringement cases and new technology protection. Write detailed white papers, patents and articles for state of the art technologies. Performed due diligence activities for large purchases in terms of technology assessment, competitive analysis, resource utilization and product roadmaps. This was the lead technical role in several acquisitions.

In a development capacity, developed and inspired unique functional components for a next generation head and neck computed tomography unit. Invented algorithms in scatter correction, focal trough detection and various visualization mechanisms. Developed a revolutionary panoramic image capture modality that enables the practitioner to perform unprecedented imaging. Performed management duties for volume understanding (segmentation, estimation and detection of physical shapes) and movement detection algorithms for integration into a motion corrected sensor. Developed hardware assisted processing to offload processing requirements to dedicated components using soft core FPGA programming, embedded LINUX, integrated microprocessor devices and software interface. Various Optical, X-ray and Nuclear image modalities are used to enable a growing market segment.

**President,** Sigma Vision Inc. Rockville MD Jan 2002 – Dec 2003.
Co-founder of Sigma Vision which was originally incorporated to serve as a shell for consulting activities in the high technology area specifically in the image and signal processing platforms. Researched, designed and developed a line of products which spans Radiography/Fluoroscopy imaging in X-Ray modality**, Computed Radiography** (CR) in X-Ray modality, **Digital Radiography** (DR) in X-Ray Modality, Picture Archiving in all modalities and various image processing packages. Provided detailed expertise to vendors that have development work in the same area. In all aspects of this work, performed cutting edge HW/SW techniques to provide a solution along with algorithm development to overcome sensor shortcomings. The result was a stable and cost-effective offering to small and medium size diagnostic imaging centers. Performed research with several national laboratories for custom signal processing such as adaptive contrast enhancement, image stitching and mosaic, cone-beam CT and other diagnostic related imaging. The diagnostic imaging products were applied to human, veterinary and non-destructive testing applications. In a non-medical capacity, Performed several large scale consulting in areas of **Video over IP**, debugging proprietary image processing algorithms, serve as **expert witness** in large scale patent litigations and general medical imaging product development.

**Senior Vice President,** Portris Inc. Reston VA February 2001 – November 2001.
In charge of front-end **application development**, all **research and development** effort, high level **algorithm development** and technology assessment. As the first technology hire of Portris Inc., helped implement the company for product development and Venture Capital funding, provided key technology and solutions in order to achieve a suite of meaningful patents, defined product suite and development plan and in-depth architecture and planning of the product. Formulated the basis of a collaborative knowledge management system by separating content and presentation; and further decomposing content in terms of a relational paradigm of basic constituent atomic knowledge elements to for a higher level of understanding. Implemented the relational aspect in a database utilizing an appropriate **data model** that supported several abstract applications. Also provided key components of knowledge representation and modeling from inception to development. Was the leading technology and solution provider in all areas of **computing, operating systems, development platform, front-end systems, back-end systems and knowledge representation.** Served as the chief scientist for all of the technical related activities.

**Principal Consultant,** Sigma Vision, Inc. North Bethesda, MD July 2000 – May 2002.
Performed consulting services, which included proposal writing, submission, research and development. Wrote proposals for **Video Over IP, Video surveillance and Document Duplicate Detection** for submissions to government and private industry. Performed research and development in **Video Over IP** for thin clients that were java enabled. Performed design, analysis and modeling of the system for a complete software development cycle. Served as an expert witness in patent enforcement phase of Intellectual Property Law. Researched and analyzed various **X-Ray imaging** products and provided insight into their software, hardware and physics based operations. Provided technical assistance for medical imaging companies in planning, development and debugging of their systems. Developed imaging workstations for Computed Radiography, Special Purpose Video Capture and overall system design and integration. Developed embedded solutions for X-ray arm and table movement for collision avoidance.

**Chief Technical Officer,** IMACOM, Inc. Rockville MD October 1999 – January 2001.
In charge of all technical work including hardware and software research, design and implementation for **X-Ray medical imaging** application. In this position, developed software and hardware solutions, debug software and hardware problems in the system and formulated company strategy for attainable product bases. In this position, as hardware designer, used Field Programmable Logic Array to develop a **video pipeline processing, real-time storage** of live video to computer hard disks, develop **analog filter and signal exchange banks** for analog signals, designing and integrating custom graphics video cards and control systems. Also in this position, as software engineer, designed **threading software for real-time storage,** improved **image processing** capabilities and compression, created custom software, and planned, designed and implemented new customer solutions. In this capacity, managed a group of hardware and software engineers, planned and estimated project life-cycles, and was involved with new technology research and development such as **high resolution ultrasound imaging**, large format X-Ray imaging and **Video Surveillance.**

**Electronics Engineer (Research Scientist),** National Institute of Standard and Technology, Gaithersburg, MD (NIST), April 1997 – November 1999.
Member of the Multimedia and Digital Video Group, Advanced Technology Division and Information Technology Laboratory. Worked on various projects including **document image processing**, an extension of Ph.D. research, **Large image-browsing, multimedia compression and communication, medical image understanding, digital library metrics,** and **image and video indexing** problems. Used **mathematical formulation** and **media processing tools** to find new and innovative techniques to archive, process and transmit information. Worked on **pattern recognition and feature extraction** research for medical application. Initiated interest in **video indexing** and **digital library metrics** research in the group. Performed as a principal investigator in the above projects. Attended MPEG standardization meetings to provide technical expertise to NIST's Advanced Technology Program's initiatives.

**Affiliate Research Scientist,** Center for Automation Research (CfAR), Language and Media Processing Laboratory (LAMP), University of Maryland, College Park MD, April 1997 – present.
Hold an affiliate research scientist position at LAMP to collaborate with researchers at the lab in areas such as **video indexing and image enhancement and multimedia processing, archiving and indexing.**

**Part time lecturer,** University of Maryland Baltimore County (UMBC), Department of Computer Science, August 1998 – September 1999.
Held a lectureship position at UMBC teaching Assembly language programming. This position is held under an accredited program for a computer science curriculum.

**Graduate Research Assistant (GRA),** Center for Automation Research (CfAR), University of Maryland, College Park, MD March 1995-April 1997.
Worked with Dr. David Doermann (co-director of LAMP) with Professor Rama Chellappa (Associate director of CfAR) as the academic advisor.
**Ph.D. Thesis: Document image compression and analysis:** constructor of an information hierarchy geared towards **information retrieval**. Preservation of symbol **Structure** was exploited to yield natural extensions to **lossy compression, progressive transmission** and promotion of **compressed-domain** document image processing. Various concepts were considered including **vector quantization, wavelet transforms, pattern matching and entropy analysis** to demonstrate performance and feasibility. Several mathematical analysis tools were used along with application development and testing.
**Projects:** Involved in handwriting character recognition utilizing **energy minimization** techniques to reconstruct handwritten strokes. A priori knowledge of character shapes was used to detect and segment off-line characters. The unique aspect of this research was exploitation of connected features (**primitives)** and use of an appropriate cost function to optimize a **minimum cost solution.** Also of interest was derivation of the detected character's stability and **region of convergence** to determine a goodness of fit parameter for higher-level programming. Part of this research involved **mathematical analysis** in the field of **optimization** and **control** with applications to the field of **image processing.** The rest involved programming and proof of principle. Was one of the pioneering researchers to develop the document duplicate detection work at the lab. Utilized **Region of Convergence** performance criteria and **random-process analysis** in conjunction with **Tree-based** search algorithm and **N-Gram** signature creation  to prove, design and implement a complete detection system.

**Research Engineer,** Glynn Scientific Inc. Annapolis, MD Oct. 1989- Oct. 1994.
**Analysis:** Performed optimization analysis on several cost functions spanning various performance criteria. Used **Matrix Algebra, optimal control theory,** and **partial differential analysis** to derive various optimal conditions. Performed analysis on fingerprints, OCR, SONAR systems and stock market performance problems. While performing such tasks, played the role of  program manager in some cases and task leader in others. Also involved in writing problem statements, statements of work, required time and manpower for purposes of project life analysis and system requirements for the overall package.
**Image processing:** Performed various image enhancements to aid in feature finding, classification and detection algorithms. Analyzed pattern recognition problems using **quadratic Bayes** algorithms, **maximum likelihood** algorithms, **nearest neighbor** algorithms and **model/template matching** algorithms.  Also applied neural network techniques for feature extraction and pattern recognition. Image enhancement was done in the fingerprint and OCR cases. Pattern recognition and detection were performed on fingerprints, OCR, SONAR and RADAR problems. Responsibilities included program management, principal researcher and support.
**RADAR:** Supported data acquisition and proof of principle pertaining to **ATR** concepts. Designed and tested performance analysis tools to be used for classification of various targets. Analyzed system performance under limited conditions using noise, resolution and target models. Involved in overall system support and syntactic implementation. Responsibilities for these tasks were only in support and did not involve full time effort.
**ASW:** Performed and analyzed various methods of **signal processing** and **detection** for implementation in sonar systems. Various signals were designed with frequency and phase hopping characteristics in order to meet system requirements for **counter-detection, resolution in range and Doppler.** Effects of **multi-path** and **reverberation** were considered. Statistical **probabilities of detection, signal interception and false alarms** were thoroughly investigated. Adaptive and standard signal processing algorithms were utilized for improved performance under certain conditions (including ESPRIT and MUSIC algorithms). Supported design and data processing related to ASW platform sea tests. Mostly involved in a support role while taking the lead in the area of statistics in counter detection.
**Systems Administration:** As the systems manager, responsible for maintaining the in-house computer systems and for recommending new technology and solutions for the company's computing needs. Special tasks included installing and streamlining work to be done on an array processor and providing compatible modes of data transfer.

5

**Research/Teaching Assistant,** Department of Electrical Engineering and Computer Science, UIC, Chicago, IL. September 1987 to August 1989.

**Research: Digital signal processing and homomorphic analsysis** on arterial load for isolating reflection. Control system design and analysis was done for master's work. Continuous and discrete time control were thoroughly investigated for process control. Exploited the characteristics of process control plants to get a robust controller able to withstand the changing of the process and simple enough to re-tune with a calculator.

**Teaching:** Taught departmental courses in computer architecture and computer programming which included classes in excess of 30 students. Taught laboratory and discussion sessions on a wide variety of subjects including, but not limited to, computer programming, circuits, electric machinery and control systems.

**Research Engineer,** School of Engineering and Architecture, CUA, Washington DC, September 1985 – August 1987.

Worked as a systems engineer in the robotics lab and the CAD lab. Designed and built peripheral circuitry for the computer and control of various robot actuators. Performed experiments to control an underwater robot. Was very active in computer programming and hardware design. Designed voice synthesizer board and wrote machine language program to use the board. Designed and implemented a microprocessor-based device to notify an underwater diver of depth, time under water, time left with air in tank and decompression depth and time needed. This device was designed using a 6800 microprocessor, UV-Prom and associated electronics.

## Consulting Experience:

Coastal Communication Consultants, Inc., September 2017 – Now. Serve as a consultant and a contractor to various opportunities as a Subject Matter Expert in the general area of image and data science.

GHB Intellect, June 2013 – Now. Provide consulting services for patent and intellectual property review and analysis.

Northstrat Inc, November 2013 – September 2017. Serve as a consultant and a contractor to various opportunities as a Subject Matter Expert in the general area of image science.

Parsa Wireless Communications, February 2012 – April 2016. Provide consulting services for patent and intellectual property review and analysis.

ITT-Exelis-Harris, June 2009 – November 2013. Serve as a consultant and a contractor to various opportunities as a Subject Matter Expert in the general area of image science.

## Patents:

- O. Kia, Secure and mobile biometric authentication for electronic health record management, US Patent 9,553,727 on January 24, 2017.
- O. Kia, Digital Radiographic Device Having a Linear Scanner, US Patents 8,662,749, 9,125,571 and 9,380,989 on March 4, 2014, September 8, 2015 and July 5, 2016.
- O. Kia and J. Graybill, System and method for providing temporal-spatial registration of images, US Patent 9,071,819, June 30, 2015.
- C. Rodgers and O. Kia, System and method of visualization of species characterization, dynamics and stratification of the magnetosphere, US Patent 9,037,413, May 19, 2015.
- O. Kia, Methods, apparatus, and systems for super resolution of LIDAR data sets, US Patent 8,818,124, August 26, 2014.
- O. Kia and C. Rodgers, System and method of visualization of species characterization, dynamics and stratification of the magnetosphere, US Patent 8,616,052, December 31, 2013.

- O. Kia and S. Dockstader, Photogrammetric method and system for stitching and stabilizing camera images, US Patent 8,559,757, October 15, 2013.
- H. Tancredi, E. Marandola, F. Speranza, and O. Kia, Adjustable scanner, US Patent 8,503,603, August 6, 2013.
- O. Kia, C. Rodgers and B. Bradford, Systems and Methods for Space Situational Awareness and Space weather, US Patent 8,193,968, June 5, 2012.
- A. Singh, E. Marandola, O. Kia and U. Mundry, Locating an Elongated Object in a Three Dimensional Data Array, US Patent 7,817,830, October 2010.
- O. Kia, K. Subramanyan and P. Crawn, Method and Apparatus for Generating A Panoramic Image By Combining Image Data Generated From Multiple Perspectives, US Patent 7,756,247, July 2010.
- J. Gregorio and O. Kia, Cephalometric X-ray Imaging Apparatus, Patent Application 20090196395, August 2009.
- A. Singh, E. Marandola, O. Kia and U. Mundry, Generating Panoramic Views of the Jaw Using a Fixed Reference Point and Crossing Points of Multiple Rays, US Patent 7,545,909, June 2009.
- A. Singh and O. Kia. Location of focal place. US Patent 7,460,638, Dec. 2008.
- O. Kia, A. Singh, E. Marandola and U. Mundry, Scatter Correction, Patent Application 20070086560, April 2007.
- K. Hartigan, S. Hunter, D. Loukonine, B. Morgan and O. Kia. Method and System for Tracking and Reporting Time Spent on Tasks. US Patent 6,832,176, Dec. 2004.
- C. Henderson and O. Kia. Method and System for Collaborative Knowledge Management, United States Patent Application, 20030009536, Jan. 2003.

## Publications:

- A. Bright, O. Kia, J. Graybill, S. Cruz, Shape-based topologies for real-time onboard image generation. In proceeding of the SPIE, Airborne Intelligence, Surveillance, Reconnaissance (ISR) Systems and Applications IX, volume 8360, May 1, 2012.
- C. Rodgers and O. Kia, Ionosphere Mitigation Through Species Characterization And Stratification, AMS Annual Meeting, *8th Conference on Space Weather,* Spokane, Washington, January 2011.
- O. Kia, C. Rodgers and B. Bradford, Dual use RF-based Sending for Proximity and Space Weather Event Detection. In proceeding of the *SPIE, Radar Sensor Technology XIV,* volume 7669 pp. 76690C-7669C-12, 2010.
- O. Kia, 3D Imaging: Should I go digital, Orthodontic Products, June 2004.
- O. Kia and D. Doermann. Residual coding in document image compression. *IEEE Transactions on Image Processing,* 9:961-969, 2000.
- O. Kia, J. Vossoughi, G. Lopez and S. Sirohey. Image Based Evaluation of Vascular Residual Strain. In *International Journal of Artificial Intelligence Tools,* 9:247-263, 2000.
- O. Kia, D. Doermann, A. Rosenfeld and R. Chellappa. Symbolic compression and processing of document images. *Computer vision and Image Understanding,* 70:335-319, 1998.
- O. Kia and D. Doermann. Document image coding for processing and retrieval. *Journal of VLSI Signal Processing Systems for Signal, Image and Video Technology,* 20:121-135, 1998.
- H. Li, D. Doermann and O. Kia. Automatic Text Detection and Tracking in Digital Video. *IEEE Transactions on Image Processing,* 9:147-156, 2000.
- H. Li, D. Doermann and O. Kia. Text Extraction, Enhancement and OCR in Digital Videos. *Book chapter in Springer Verlag, 1999.*
- D. Doermann, H. Li and O. Kia. The detection of duplicates in document image databases. In *Image Vision and Computing Journal,* (16) 12-13 (1998), pp 907-920.
- Omid E. Kia. *Document Image Compression and Analysis.* Ph.D. thesis, University of Maryland, College Park, 1997.
- O. Kia, S. Sirohey and J. Vossoughi. Image-based Evaluation of Vascular Residual Strain. In proceedings of the *International Conference on Information Intelligence and Systems, pp. 444-451, 1999.*
- J. Sauvola and O. Kia. Distributed Processing of Multimedia Extended Documents. In the proceedings of the *International Workshop on Multimedia Signal Processing, 1999.*
- O. Kia, J. Sauvola and D. Doermann. Network-diffused media scaling for multimedia content services. *In Interactive Distributed Multimedia Systems and Telecommunication Services,* Eds. M. Diaz, P. Owezarski

7

and P. Senac. In proceedings of the *International Workshop on Interactive Distributed Multimedia Systems and Telecommunications Services, pp. 149-162, 1999.*

- H. Li, O. Kia and D. Doermann. Text Extraction and Recognition in Digital Video. In the proceedings of the *International Workshop on Document Analysis Systems,* pp 119-128, 1998.
- H. Li, D. Doermann and O. Kia. Automatic Text Extraction and Tracking in Digital Video. *LAMP Technical Report,* LAMP-TR-028, CAR-TR-900, CS-TR-3962, Dec. 1998.
- H. Li, O. Kia and D. Doermann. Text Enhancement in Digital Video. In the proceedings of the *SPIE – Document Recognition and Retrieval,* volume 3651, pp 2-9, 1999.
- O. Kia and J. Sauvola. Active documents for mobile services. In the proceedings of the *IEEE workshop on Multimedia Signal Processing,* pp. 227-232, 1998.
- O. Kia and A. Schaff. Data Representation and Handling for Large Image Browsing. In the proceedings of the *SPIE – Multimedia Storage and Archiving Systems,* pp.  37-46, 1998.
- O. Kia and D. Doermann. OCR-based Rate-Distortion Analysis of Residual Coding. In the proceedings of the *International Conference on Image Processing,* Volume III, pp. 690-693, 1997.
- O. Kia and D. Doermann. Integrated Segmentation and Clustering for Enhanced Compression of Document Images. In the proceedings of the *International Conference on Document Analysis and Recognition,* Volume I, page 406, 1997.
- O. Kia and D. Doermann. Document Image Coding for Processing and Retrieval. In Proceedings of the *IEEE Workshop on Multimedia Signal Processing,* pp. 331-336, 1997.
- J. Sauvola and O. Kia. Hyperdocument management for compression, transmission and processing. In Proceedings of the *IEEE Workshop on Multimedia Signal Processing,* pp. 537-542, 1997.
- O. Kia and D. Doermann. Structure-preserving Image Compression and Transmission. In Proceedings of the *International Conference on Image Processing,* Volume I, pp. 193-196, 1996.
- O. Kia and D. Doermann. Symbolic Compression for Document Analysis. In Proceedings of the *International Conference on Pattern Recognition,* Volume III, pp. 664-668, 1996.
- O. Kia, D. Doermann and Rama Chellappa. Compressed-domain Document Retrieval and Analysis. In Proceedings of the *SPIE – Multimedia Storage and Archiving Systems,* Volume 291, pp. 176-187, 1996.
- D. Doermann and O. Kia. Hybrid thinning through reconstruction. In Proceedings of the *International Conference on Document Analysis and Recognition,* Volume II, pp. 632-635, 1995.

## Expert Witness Cases:

The following is a complete list of cases which I have provided expert opinions through either trial testimony, deposition, report, or declarations.

District of Delaware – Fenster Family Patent Holding *et al.* v. Philips Medical *et al.* – Consultant and arbitration for the plaintiff.

4:03-CV-276 – Eastern District of Texas, Sherman – STM v. Motorola *etc al.* – Expert report for the plaintiff.

C.A. No. 04-0048 – District of Delaware – Fenster Family Patent Holding *et al.* v. Siemens Medical Solutions USA *et al.* – Expert report and Deposition assistant for the plaintiff.

04-CV-01363 – Southern District of New York – John Amico *et al.* v. Nhega LLC *et al.* – Expert report for the plaintiff.

2:08CV389 – Eastern District of Texas, Marshall Division – Hospital Systems Corporation v. General Electric Company *et al.* – Expert report for invalidity for the plaintiff.

22-C-09-000274 MM – Circuit Court for Wicomico County, Maryland, Diana Donaway et al, v. Jodi D. Jones M.D. et. al. – October 2010 – Expert for Defendant on HIS system.

Patent Interference No. 105,890 (SCM) – USPTO: Patent Trial and Appeal Board – Andreas Kotowski *et-al* (Rapiscan Systems, Inc.) v. Richard Mastronardi et-al (American Science and Engineering Inc.) – June 2013.

2:10-CV-00029 – Eastern District of Texas, Marshall – Princeton Digital Image Corporation v. Canon Inc *et al.* – Expert consulting for plaintiff.

Patent Re-examination 90/013,078 – USPTO: Declaration for patent examination for Joseph P. Jaronczyk Jr. of LittelFuse, Inc. – June 2014.

2:13-cv-0052 – Eastern District of Teaxx, Marshall – Trover Group Inc. etc. al. v. Tyco International LTD et. al, - April 2014 – Expert for plaintiff.

1:14-cv-00261-UNA – District court for the District of Delaware – Celebrate International LLC v. LeapFrog Enterprises, Inc. et. al., February 2014 – Expert for plaintiff.

Inter Partes Review of US Patent No. 5,751,346, AXIS Communications Inc. et. al. v. Trover Group Inc. – United States Patent and Trademark Office before the Patent Trial and Appeal Board – December 2014 – Expert for Defendant.

Civil No. 385518V, The Circuit Court for Montgomery County, Maryland, ProExpress Distributors LLC v. Grand Electronics, Inc. Et. Al., February 2015 – Expert for defendant.

2:13-cv-1047-JRG Consolidated Lead case, United States District Court for the Eastern District of Texas Marshall Division, Trover Group Inc. and the Security Center Inc. v. Dedicated Micros Inc. et. al., April 2015 – Expert for plaintiff

12CV0380 CAB (DHB) United States District Court Southern District of California, SONIX Technology Co. Ltd. v. Kenji Yoshida and Grip IP, PTE, Ltd, April 2015 – Expert for defendants.

1:11-cv-00117-LY Consolidated Lead Case, United States District Court for the Western District of Texas Austin Division, Source Prose, Inc. v. AT&T Mobility et. al, May 2015 – Expert for Plaintiff.

13-cv-453-SLR-SRF, United States District Court for the District of Delaware, Intellectual Ventures I et. al, v. Toshiba Corporation et. al. December 2015 – Expert for Plaintiff.

6:14-cv-680-RWS, Consolidated case, United States District Court Eastern District of Texas Tyler Division, TracBeam LLC, v. T-Mobile US, Inc. et al, and TracBeam LLC, v. Apple Inc., March 2016 – Expert for Plaintiff.

2:15-cv-1503, United States District Court for the Eastern District of Texas, Marshall Division, TIVO Inc. v. Samsung Electronics Co. LTD et al., April 2016 – Expert for Defendant.

IPR2016-00212, Inter Partes Review of U.S. Patent 7,974,339, Google Inc. v. Vedanti Systems Limited – United States Patent and Trademark Office before the Patent Trial and Appeal Board – May 2016 – Expert for defendant.

2:15-cv-01274-JRG-RSP, Blitzsafe v Honda et. al., United States District Court for the Eastern District of Texas Marshall Division – August 2016 – Expert for Plaintiff.

2:16-cv-980, Intellectual Ventures II LLC v. FEDEX Corp et al. United States District Court for the Eastern District of Texas Marshall Division – March 2017 – Expert for Plaintiff.

8:16-cv-01194-MSS-TGW, University of South Florida Research Foundation, Inc. v. Fujifilm Medical Systems USA, United States District Court for the Middle District of Florida, Tampa Division – July 2017 – Expert for Plaintiff.

Investigation No. 337-TA-1061, In the Matter of Certain Bar Code Readers, Scan Engines, Products Containing the Same, and Components Thereof, United States International Trade Commission, Honeywell v. Code – October 2017 – Expert for Plaintiff.

4:16-cv-03595, Arya et al v. Dufossat et al, United States District Court for the Southern District of Texas, Houston Division – February 2018 – Expert for defendant.

1:12-cv-01461, Princeton Digital Image Corporation v. Konami Digital Entertainment Inc., et al. United States District Court for the District of Delaware – May 2018 – Expert for Plaintiff.

2:17-cv-00516-JRG, AGIS v Apple, et al. United State District Court for the Eastern District of Texas Marshall Division – July 2018 – Expert for Plaintiff.

IPR2018, Inter Partes Review of U.S. Patent 8,331,715, Samsung Electronics Co. LTD. v. Fotonation Limited – United States Patent and Trademark Office before the Patent Trial and Appeal Board – November 2018 – Expert for Plaintiff.

17-1059, First Wheel Management Limited v. Inventist, Inc. and Shane Chen, United States District Court for the District of Delaware – January 2019 – Expert for Plaintiff.

IPR2019-00218, Inter Partes Review of U.S. Patent 7,965,408, Altamont Software Inc. v. Sorna Corporation – United States Patent and Trademark Office before the Patent Trial and Appeal Board – February 2019 – Expert for Defendant.

2:17-cv-00422-JRG, Blitzsafe v Mercedes et. al., United States District Court for the Eastern District of Texas Marshall Division – April 2019 – Expert for Plaintiff.

C.A. No. 17-1386-LPS-CJB, Osseo Imaging v Planmeca USA, United States District Court for the District of Delaware, May 2019, Expert for Plaintiff.

Civil Action No. 2:18-cv-00506-JRG, UNILOC v. Samsung et al, United States District Court for the Eastern District of Texas Marshall Division – September 2019 – Expert for Plaintiff.

2:18-CV-00171-RWS-RSP, CXT Systems v. Academy et al, United States District Court for the Eastern District of Texas Marshall Division – September 2019 – Expert for Plaintiff.

Investigation No. 337-TA-1061, In the Matter of Certain Bar Code Readers, Scan Engines, Products Containing the Same, and Components Thereof, United States International Trade Commission, Honeywell v. Opticon – October 2019 – Expert for Plaintiff.

C/09/591436, Hand Held Products v. Opticon, District Court The Hague – July 2020 – Expert for Plaintiff.

2:19-cv-00361-JRG, AGIS v.  Google et al, United States District Court for the Eastern District of Texas Marshall Division – September 2020 – Expert for Plaintiff.

C.A. No. 20-842 (CFC) AMO v. ALCON v. AMO & Johnson & Johnson, District Court for the District of Delaware – February 2021 – Expert for Plaintiff in counter suit.

IPR2021-01003, Inter Partes Review of U.S. Patent 8,398,236, Johnson & Johnson Surgical Vision Inc, v. ALCON Inc – United States Patent and Trademark Office before the Patent Trial and Appeal Board – September 2021 – Expert for Defendant.

2:20-cv-00349-JRG LONGHORN HD v. NETSCOUT SYSTEMS, District Court for the Eastern District of Texas, Marshall Division – July 2021 – Expert for Plaintiff.

2:21-cv-00099-JRG LONGHORN HD v. JUNIPER NETWORKS, District Court for the Eastern District of Texas, Marshall Division – November 2021 – Expert for Plaintiff.

2:20-cv-0319-JRG, 2:21-cv-0110-JRG United Services Automobile Association v. PNC Bank, District Court for the Eastern District of Texas, Marshall Division – July 2021 – Expert for Defendant.

Investigation No. 337-TA-1285, In the Matter of Certain Bar Code Scanners, Mobile Computers with Barcode Scanning Capabilities, Scan Engines, and Components Thereof, United States International Trade Commission, Honeywell v. Zebra – September 2021 – Expert for Plaintiff.

IPR2022-00218, Inter Partes Review of U.S. Patent 7,400,704, Sigray Inc, v. Carl Zeiss X-Ray Microscopy Inc – United States Patent and Trademark Office before the Patent Trial and Appeal Board – November 2021 – Expert for Plaintiff.

2:21-cv-00148-JRG NETWORK MONITORING LLC v. SKYSCANNER LTD, District Court for the Eastern District of Texas, Marshall Division – February 2022 – Expert for Plaintiff.

IPR2022-01576, Inter Partes Review of U.S. Patent 9,538,985, Butterfly Network Inc., v. FujiFilm Sonosite, Inc. – United States Patent and Trademark Office before the Patent Trial and Appeal Board – September 2022 – Expert for Plaintiff.

5:21-cv-01129-EJD, Carl Zeiss X-ray Microscopy, Inc, v. Sigray Inc., District Court Northern District of California – October 2022 – Expert for Defendant.

11

2:20-cv-00851-TSZ, International Business Machines Corporation v. Zillow Group, Inc., District Court Western District of Washington at Seattle – October 2022 – Expert for Plaintiff.

IPR2022-01374, Inter Partes Review of U.S. Patent 7,557,711, Zebra Technologies Corporation, v. Lone Star SCM Systems, LTD – United States Patent and Trademark Office before the Patent Trial and Appeal Board – October 2022 – Expert for Defendant.

6:22-cv-004433, 3SHAPE A/S v. Medit Corp, District Court for the Western District of Texas, Waco Division – December 2022 – Expert for Defendant.

Investigation No. 337-TA-1324, In the Matter of Certain Mobile Electronic Devices, United States International Trade Commission, Maxell v. Motorola, Lenovo et. al. – November 2022 – Expert for Defendant.

5:22-CV-00069-RWS, Pantech v. OnePlus, District Court for the Eastern District of Texas Texarkana Division – August 2023 – Expert for Defendant.

IPR2023-00890, 00934, 01017, Inter Partes Review of U.S. Patents 8,014,943, 8.478,527 and 8,032,297, BMW of North America LLC v. Northstar Systems LLC – United States Patent and Trademark Office before the Patent Trial and Appeal Board – January 2024 – Expert for Defendant.

3:23-cv-1937, Kustom Signals Inc. v. Applied Concepts Inc., District Court for Northern District of Texas Dallas Division – January 2024 – Expert for Plaintiff.

Investigation No. 337-TA-1379/1380, In the Matter of Certain Certain Video Capable Electronic Devices, Including Computers, Streaming Devices, Televisions, and Components and Modules thereof, United States International Trade Commission, Nokia v. Hewlett Packard, Amazon et. al. – March 2024 – Expert for Plaintiff.

5:23-CV-00092-RWS, Maxell v. Samsung, Eastern District of Texas Texarkana Division – October 2024 – Expert for Defendant.

IPR2025-00635, 00314, 00275, 00314, 00316, 00275 Inter Partes Review of U.S. Patents 11,871,088, 10,425,697, 11,039,218, 10,425,697, 10805687 and 11039218 Sportradar AG v. SportsCastr Inc – United States Patent and Trademark Office before the Patent Trial and Appeal Board – December 2024 – Expert for Plaintiff.

IPR2024-00923, 00924, 00925, Inter Partes Review of U.S. Patents 10,873,685, 7,612,805, and 8,451,339, SONY Corporation v. Optimum Imaging Technologies LLC – United States Patent and Trademark Office before the Patent Trial and Appeal Board – January 2025 – Expert for Defendant.

2:25-cv-00081-JRG, Valtrus Innovations LTD v. The Home Depot Inc, Eastern District of Texas Marshall Division – January 2025 – Expert for Plaintiff.

**Computer Languages:**

C/C++ (UNIX, MS-Windows), Visual Basic, JAVA (Unix, Windows, Symbian EPOC), Assembly language (8086, 68000, Z80) and Matlab.

**Systems:**

X86 (MS-Windows, LINUX, DOS), Sun SPARC (SunOS, Solaris), UNIX (HPUX, AIX, SGI), Macintosh, IBM Mainframe, Digital VAX/VMS.

**Associations and awards:**

Affiliate research faculty at University of Maryland at College Park, Language and Media Processing Laboratory and University of Oulu, Finland, Information Processing Laboratory.
Member of Tau Beta Pi, Eta Kappa Nu, and IEEE Computer and Signal Processing Group, 1983-present.
Tuition Scholarship recipient, UIC, 1987-1989.
Dean's List, CUA, 1985-1987.