**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No.: 0:24-cv-62093-EA-PAB**

**T5.2 LTD.,**

        **Plaintiff,**

**v.**

**CITRIX SYSTEMS, INC.**

        **Defendant.**

_____/

**PLAINTIFF T5.2 LTD.'S OPENING CLAIM CONSTRUCTION BRIEF**

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................................ 1

II.  BACKGROUND AND THE PATENTS-IN-SUIT ......................................................... 1

    A.  Background ................................................................................................................ 1

    B.  The Patents-in-Suit. ................................................................................................. 2

        1.  The Compression Assistance Patents ......................................................... 3

        2.  The GPU-Sharing Patent ............................................................................ 5

III.  LEGAL STANDARDS ..................................................................................................... 5

    A.  General Legal Standards Governing Claim Construction ......................................... 5

    B.  Legal Standards Governing 112(6). ......................................................................... 7

IV.  DISPUTED TERMS ......................................................................................................... 8

    A.  <u>Term #1</u>: "intercepting" \ "intercepted" ................................................................. 8

    B.  <u>Term #2</u>: "graphics instruction modification module (GIMM)" ........................... 9

        1.  The Term "graphics instruction modification module" is Not Governed by
            § 112, ¶ 6. ................................................................................................ 10

        2.  In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct
            Function and Corresponding Structure. ................................................... 11

    C.  <u>Term #3</u>: "instructions for said graphics processor module" / "graphics
        instruction(s)" / "instructions for generating a first frame" / "instructions for
        generating a second frame" .................................................................................. 12

    D.  <u>Term #4</u>: "graphics data" ................................................................................... 14

    E.  <u>Term #5</u>: "compression assistance data (CAD)" ................................................. 16

    F.  <u>Term #6</u>: "wherein handshake signalling is provided between the encoder and a
        least one other step" ............................................................................................. 18

    G.  <u>Term #7</u>: "motion vector"………………………………………………………..20

    H.  <u>Term #8</u>: "wherein the step of identifying an attribute comprises at least one step
        selected from a group consisting of identifying the type of one of the outputted
        graphics instructions, identifying the contents of one of the outputted graphics
        instructions and any combination thereof" ......................................................... 21

    I.  <u>Term #9</u>: "an instruction interception module" ................................................... 22

        1.  The Term "instruction interception module" is Not Governed by § 112, ¶
            6. .............................................................................................................. 23

        2.  In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct
            Function and Corresponding Structure. ................................................... 25

J.     Term #10: "compression assistance instructions" .................................................. 26

K.     Term #11: "a transmission module" .................................................................... 26

     1.     The Term "a transmission module" is Not Governed by § 112, ¶ 6. ........ 27

     2.     In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure. .................................................... 27

L.     Term #12: "an instruction interceptor capable of intercepting a first set of instructions for said graphics processor module, said first set of instructions relating to how to render image frames, and generating an output comprising a second set of instructions for said graphics processor module" ............................................ 28

     1.     The Term "an instruction interceptor capable of intercepting …" is Not Governed by § 112, ¶ 6. ................................................................... 29

     2.     In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure. .................................................... 29

M.     Term #13: "a processing function capable of processing said first set of instructions or said second set of instructions or a combination thereof in said graphics processor module, said processing function having an output capable of generating first graphics data, said first graphics data comprising image frames" ........................ 29

     1.     The Term "a processing function … in said graphics processor module" is Not Governed by § 112, ¶ 6. ................................................................... 30

     2.     In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure. .................................................... 32

N.     Term #14: "a processing function capable of processing said second set of instructions in said graphics processor module, said processing function being further capable of producing an output comprising second graphics data" .......... 33

     1.     The Term "a processing function … in said graphics processor module" is Not Governed by § 112, ¶ 6. ................................................................... 33

     2.     In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure. .................................................... 34

O.     Term #15: "a compression assistance data generator capable of receiving an input comprising said second graphics data and producing an output comprising compression assistance data" ................................................................................ 34

     1.     The Term "a compression assistance generator … " is Not Governed by § 112, ¶ 6. ................................................................................................. 35

     2.     In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure. .................................................... 38

P.     Term #16: "…said different graphics texture instructions define at least one texture attribute which is arranged to be substantially unique to an area within an image frame in the second graphics data." .................................................................... 38

## **TABLE OF AUTHORITIES**

### **Cases**

*Alacritech, Inc .v. Century Link Communications LLC*,
   271 F.Supp.3d 850 (E.D. Tex. 2017) ..................................................................... 23

*Anchor Wall Sys. v. Rockwood Retaining Walls*,
   340 F.3d 1298 (Fed. Cir. 2003) ......................................................................... 39

*Apple v. Samsung Elecs.*,
   786 F.3d 983 (Fed. Cir. 2015) ........................................................................... 39

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
   709 F.3d 1348 (Fed. Cir. 2013) ......................................................................... 14

*Barkan Wireless Access Tech., L.P., v. Cellco Partnership*,
   No. 2:16-CV-293-JRG-RSP, 2017 WL 2099565 (E.D. Tex. May 14, 2017) .................... 10, 23

*Brown v. 3M*,
   265 F.3d 1349 (Fed. Cir. 2001) ........................................................................... 6

*Chimie v. PPG Indus., Inc.*,
   402 F.3d 1371 (Fed. Cir. 2005) ........................................................................... 6

*Climb Tech. v. Verble*,
   No. 1:05-CV-864-LY, 2008 WL 11334955 (W.D. Tex. March 27, 2008) .............................. 39

*ContentGuard Holdings, Inc. v. Amazon.com, Inc.*,
   No. 2:13-CV-1112-JRG, 2015 WL 1289321 (E.D. Tex. Mar. 20, 2015) ................................ 18

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
   424 F.3d 1293 (Fed. Cir. 2005) ......................................................................... 22

*Deere & Co. v. Bush Hog*,
   703 F.3d 1349 (Fed. Cir. 2012) ......................................................................... 39

*Dyfan, LLC v. Target Corp.*,
   28 F.4th 1360 (Fed. Cir. 2022) ................................................................... 7, 10, 23

*Ecolab v. Envirochem*,
   264 F.3d 1358 (Fed. Cir. 2001) ......................................................................... 40

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
   435 F.3d 1366 (Fed. Cir. 2006) ......................................................................... 22

*Entrust Datacard Corp. v. Atl. Zeiser GmbH*,
   No. 3:17-CV-110-J-39MCR, 2018 WL 3599217 (M.D. Fla. June 29, 2018) ......... 27, 30, 35, 36

*Enzo Biochem, Inc. v. Applera Corp.*,
   599 F.3d 1325 (Fed. Cir. 2010) ......................................................................... 19

*Exmark Manuf. Co. v. Briggs and Stratton Power Products Group*,
   879 F.3d 1332 (Fed. Cir. 2018) ......................................................................... 39

*Finjan, Inc. v. Secure Computing Corp.*,
    626 F.3d 1197 (Fed. Cir. 2011) .................................................................................... 5

*Genband USA LLC v. Metaswitch Networks, Ltd.*,
    2015 WL 4722185 (E.D. Tex. Aug. 7, 2015) ............................................................. 23

*Grober v. Mako Products*,
    686 F.3d 1335 (Fed. Cir. 2012) .................................................................................... 6

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
    607 F.3d 776 (Fed. Cir. 2010) .................................................................................... 18

*Hill-Rom Servs. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014) .................................................................................... 6

*In re Downing*,
    754 Fed. App'x 988 (Fed. Cir. 2018) ......................................................................... 22

*In re Katz Interactive Call Processing Pat. Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) .................................................................................... 6

*In re Power Integrations, Inc.*,
    884 F.3d 1370 (Fed. Cir. 2018) .................................................................................. 13

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) .................................................................................... 6

*Larada Sciences, Inc. v. Pediatric Hair Solutions Corporation*,
    2019 WL 4024956 (W.D.N.C. 2019) ......................................................................... 40

*LNP Engineering Plastics, Inc. v. Miller Waste Mills, Inc.*,
    275 F.3d 1347 (Fed. Cir. 2001) .................................................................................. 40

*Maxell Ltd. v. Apple Inc.*,
    2020 WL 10456875 (E.D. Tex. Mar. 18, 2020) ........................................................ 35

*MorphoTrust USA, LLC v. United States*,
    132 Fed. Cl. 419 (2017) .............................................................................................. 21

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) .................................................................................................... 19

*Intellectual Ventures II LLC v. Fedex Corp.*,
    No. 2:16-cv-00980-JRG, 2017 WL 5896180 (E.D. Tex. Nov. 29, 2017) .......................... 10, 23

*Maxell Ltd. v. Apple Inc.*,
    No. 2:18-CV-295- JRG, 2020 WL 569856 (E.D. Tex. Feb. 5, 2020) ...................................... 36

*One-E-Way v. Int'l Trade Comm'n*,
    859 F.3d 1059 (Fed. Cir. 2017) .................................................................................. 39

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................................... Passim

*Robert Bosch, LLC v. Snap-On Inc.*,
    769 F.3d 1094 (Fed. Cir. 2014) .................................................................................... 7

*S3G Tech., LLC v. UniKey Tech., Inc.*,
   No. 6:16-cv-400-RWS- KNM, 2017 WL 5178837 (E.D. Tex. July 7, 2017) .......................... 23

*Silicon Labs., Inc. v. Cresta Tech. Corp.*,
   No. 14-CV-03227-PSG, 2016 WL 791792 (N.D. Cal. Mar. 1, 2016) .................................... 21

*Stryker Corp. v. Zimmer Inc.*,
   No. 1:10-CV-1223, 2012 WL 12883650 (W.D. Mich. Nov. 29, 2012) ................................... 17

*TecSec, Inc. v. Int'l Bus. Machines Corp.*,
   731 F.3d 1336 (Fed. Cir. 2013) ........................................................................................ 30

*Thorner v. Sony Computer Entertainment America*,
   669 F.3d 1362 (Fed. Cir. 2012) .......................................................................................... 6

*Tinnus Enterprises v. Telebrands Corporation*,
   733 Fed. Appx. 1011 (Fed. Cir. 2018) ............................................................................. 39

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) ................................................................................ 6, 8, 17

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) .................................................................................. Passim

*Zeroclick, LLC v. Apple, Inc.*,
   891 F.3d 1003 (Fed. Cir. 2018) ........................................................................................ 31

## **Statutes**

35 U.S.C. § 112(6) ................................................................................................... Passim

# I.     INTRODUCTION

Plaintiff T5.2 Ltd. ("T5.2") and defendant Citrix Systems, Inc. ("Citrix") dispute the construction of 16 terms—all proposed by Citrix—which fall into two general categories: (1) six terms that Citrix does not contend are governed by 35 U.S.C. § 112(6), and (2) ten terms that Citrix does contend are governed by § 112(6).  The parties were able to reach agreement on the construction of three terms, also proposed by Citrix.  With that said, T5.2 cannot agree to Citrix's attempts to ignore binding claim construction precedent and rewrite the claims in an overly restrictive and confusing manner.

With respect to the terms that Citrix does not contend are governed by § 112(6), Citrix's proposed constructions uniformly seek to unnecessarily rewrite the claims.  In many instances, Citrix seeks to inject limitations into the claims in direct contradiction of binding claim construction precedent (e.g., absent lexicography or clear disavowal of claim scope).  In other instances, Citrix's proposed constructions are redundant of language that is already present in the claims (or the parties' agreed constructions for a term) and will only serve to confuse the finder of fact, as opposed to providing clarity—i.e., the purpose of claim construction. Finally, Citrix incorrectly contends that several terms are indefinite.

With respect to the terms that Citrix does contend are governed by § 112(6), the claims already recite sufficient structure for performing the claimed functions.  As such, § 112(6) does not apply and the inquiry should end there.  Alternatively, to the extent the Court finds that § 112, ¶ 6 does apply to a particular term, T5.2's proposed corresponding structure, which properly adheres to the legal constructs governing § 112(6), should be adopted.

## II.     BACKGROUND AND THE PATENTS-IN-SUIT

### A.     Background

T5 Labs Ltd. ("T5 Labs"), the owner of the patents-in-suit, is the developer of software

and other technologies related to interactive graphic processing. Pursuant to its exclusive license with patent owner T5 Labs, T5.2 is the exclusive licensee with all right, title, and interest in and to the Patents. The origin of the underlying inventions began when one day Mr. Graham Clemie, the founder of T5 Labs and a named inventor on the Patents, attempted to download a video game only to discover that his computer was not powerful enough to run the video game. Mr. Clemie's background is in telecommunications and cable TV, having previously worked at companies such as Ericsson and NEC. To solve this problem, Mr. Clemie began looking into whether remote computer processing power could be utilized to run a video game, as opposed to relying solely on the processing power of, for example, a user's home computer. In other words, Mr. Clemie began researching whether the processing power of centralized servers (e.g., what is now called the "cloud") could be utilized to expand the availability of video games and other software to remote users with limited computing power. As part of their efforts, Mr. Clemie, and his co-inventor, Dedrick Duckett, invented the solutions within the field of video compression for improved hosting and operation of interactive graphics applications on centralized computer platforms. The various claims of the patents-in-suit describe inventive features and combinations of features that improved upon prior art systems and methods for (a) improving the quality of video compression for computer-generated graphics and (b) reducing latency in systems hosting the operation of interactive graphics applications on centralized computer platforms.

B. **The Patents-in-Suit.**

There are eight patents-in-suit, including U.S. Patent Nos. 7,916,147 (Ex. 2, "the '147 patent"), 8,081,192 (Ex. 3, "the '192 patent"), 8,203,568 (Ex. 4, "the '568 patent"), 8,466,922 (Ex. 5, "the '922 patent"), 9,113,146 (Ex. 6, "the '146 patent"), 9,117,285 (Ex. 7, "the '285 patent"), 9,424,621 (Ex. 8, "the '621 patent"), and 9,852,490 (Ex. 9, "the '490 patent"). All of the patents-

in-suit claim priority to and share a common U.S. patent specification with the '147 patent.[1]  The '147 patent further claims priority to Great Britain Provisional Application Nos. 0204859.3 (filed March 1, 2000), 0223687.5 (filed October 11, 2002), and 0226192.3 (filed November 9, 2002).

This case involves two types of patents: (1) the Compression Assistance Patents and (2) the GPU-Sharing Patent. The Compression Assistance Patents generally disclose novel methods and systems for compressing and transmitting interactive computer graphics produced on centralized servers to remote users. Unlike conventional methods, which performed compression by analyzing the graphics data (image data such as pixels), the invention improves compression not by analyzing data but instead by analyzing the graphics instructions that produce those data. The GPU-Sharing Patent, titled "Sharing a Graphical Processing Unit Between a Plurality of Programs," generally discloses novel methods for enabling a GPU to be shared by multiple users and compressing and transmitting to those users the image data produced by that GPU.

### 1.      The Compression Assistance Patents

The operation of interactive graphics applications (e.g., productivity tools such as Adobe Acrobat™) on a centralized server allows processing and image rendering to be performed securely on the server instead of a user's computer, permitting the user to interact with the applications through a network connection. These systems have two technical problems: (1) quality of compression (images must be heavily compressed for transmission over a network connection); and (2) network latency (delay between a user's keystroke and the server's processing the command and generating, compressing, transmitting, and decompressing a new scene must be negligible to the user). Ex. 2 at 2:39-49.

Video comprises 25 or 30 frames per second. Video compression reduces bandwidth

---

[1] Citations to the '147 patent herein are exemplary and generally are applicable to the identical citations in the common specification of each of the patents-in-suit.

requirements by transmitting only the parts of the screen that have changed between two points in time (frames). Ex. 2 at 10:60-11:20. Conventional prior art compression techniques determined these changes through "brute force" by comparing the image data, i.e. every pixel of the screen, between two frames. A computer screen comprises millions of pixels; thus, comparing image data requires a large amount of processing and increases both the cost of image compression and network latency. *Id*. at 10:60-11:20. Prior art attempts to improve compression relied on brute force comparisons of image data, and "did not allow the use of standard graphics processors," requiring the applications to be specially written to operate on, and perform the compression-related tasks of, the non-standard processing platforms, which drastically reduced the number of applications capable of running on such systems. *Id*. at 2:62-3:3, 3:17-27. Conventional techniques also did not allow the processing of graphics instructions of more than one application on a single graphics processor concurrently, requiring additional GPUs, which increased costs and space, power, and cooling requirements. *Id*. at 10:56-11:3.

The Compression Assistance Patents disclose methods and systems that improve compression and reduce latency in a way that is compatible with standard hardware (e.g., GPUs) and does not require specially written interactive applications. Unlike "natural" video from a source such as a movie camera, the images and text produced by interactive graphics applications are synthetically generated, consisting of image data (pixels) created by processing graphics instructions issued by the applications. *Id*. at 4:8-37, 21:10-17. Conventional prior art techniques crudely compared the <u>image data</u> created by processing the graphics instructions. Conversely, the invention analyses those <u>graphics instructions</u> instead of the data, enabling the determination of which image data will change before they are created with far less processing effort than prior art techniques. For example, a single graphics instruction may result in changes to only a small area

of the screen, requiring the compression and transmission of only a small number of pixels. Instead of searching a screen's millions of pixels to determine which have changed, the invention analyzes the graphics instructions issued by the application to identify the changed pixels. *Id*. at 4:56-65, 7:54-67, 10:60-11:20, 21:10-17. This novel analysis of instructions—instead of data—assists compression by reducing the processing required to perform the compression, reducing the amount of data to be compressed and transmitted, increasing compression quality, reducing required bandwidth, and reducing latency. *Id.* at 4:56-65, 21:10-17.

### 2.    The GPU-Sharing Patent

The GPU-Sharing Patent enables a GPU to be shared by multiple users and compress and transmit to those users the image data produced by that GPU. The claims recite control instructions for ensuring (1) the graphics instructions of a first user and a second user do not become entangled, Ex. 4 at 21:51-53; and (2) the image data of a first user are stored in a different memory area so they do not overlap and corrupt a second user's image data. *Id.* at 22:1-4. To coordinate compression and transmission of the data, the invention includes signaling to the compressor when the rendering of the image data is complete, which improves computer and network functionality through reduced costs and space, power, and cooling requirements. *Id.* at 21:58-67.

### III.    LEGAL STANDARDS

#### A.    General Legal Standards Governing Claim Construction.

"It is a bedrock principle of patent law that the claims of the patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). Claim terms should generally be "given their ordinary and customary meaning" to those skilled in the art as informed by the specification. *Id.* at 1312-14. However, it is not necessary to construe every claim term. *See, e.g.*, *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2011) (finding that the district court did

not err by refusing to construe a claim term); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction is "not an obligatory exercise in redundancy"). Not all claim terms require construction and where a lay person does not need assistance interpreting a claim term, the term is simply given its plain and ordinary meaning. *See, e.g.*, *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (holding that the claims did "not require elaborate interpretation"). Further, a court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *U.S. Surgical*, 103 F.3d at 1568.

There are only two exceptions to the general rule that claim terms are given their ordinary and customary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). The standards for finding lexicography and disavowal, however, are exacting. Such statements must be clear and unambiguous. *Thorner v. Sony Computer Entertainment America*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Grober v. Mako Products*, 686 F.3d 1335, 1342 (Fed. Cir. 2012). Further, it is improper to confine a claim to a particular embodiment in the specification; the claim language itself is paramount. *See, e.g., Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008); *accord Phillips,* 415 F.3d at 1325 (favoring plain and ordinary meaning of the claim language over importing limitation from the preferred embodiment). There is a strong presumption against a claim construction that excludes a disclosed embodiment. *See Chimie v. PPG Indus., Inc.,* 402 F.3d 1371, 1377 (Fed. Cir. 2005); *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011). Further, while the Court may consider extrinsic evidence, the use of extrinsic evidence must be secondary and subservient to the intrinsic evidence. *See, e.g.*, *Phillips*, 415 F.3d at 1318.

B.      **Legal Standards Governing 112(6).**

"[T]he failure to use the word 'means' … creates a rebuttable presumption ... that § 112, [¶] 6 does not apply." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, [¶] 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349.  "[T]he essential inquiry is not merely the presence or absence of the word 'means,' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022). Intrinsic evidence "can be informative in determining whether the disputed claim language recites sufficiently definite structure or was intended to invoke § 112[,] ¶ 6." *Id.* at 1365–66 (quotations omitted). "In addition, because this inquiry turns on the understanding of a person of ordinary skill in the art, we often look to extrinsic evidence when determining whether a disputed limitation would have connoted structure to a person of ordinary skill." *Id.* at 1366. Claim terms need not connote a single, specific structure, and may instead describe a class of structures and still recite sufficiently definite structure to not invoke § 112[,] ¶ 6. *Id.* at 1366 (quotations omitted).

In the present case there is a rebuttable presumption that § 112, ¶ 6 does <u>not</u> apply because the claims do not recite the word "means." *See id.* at 1365.  Therefore, the analysis proceeds in two steps: (1) the Court must determine whether the term at issue is governed by § 112, ¶ 6, then, only if the answer is yes, (2) the Court must identify any corresponding structure in the specification. *See id.* at 1367; *see also Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1097 (Fed. Cir. 2014).

## IV.    DISPUTED TERMS

### A.    Term #1:        "intercepting"[2] \ "intercepted"[3]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary. | seizing, catching, or stopping on the way from place to place |

The terms "intercepting" and "intercepted" are readily understandable, unambiguous, and do not require construction. A jury would be able to understand this term in the context of the claims. Citrix's proposed construction in fact injects more ambiguity and would confuse the jury. *See U.S. Surgical*, 103 F.3d at 1568 (purpose of claim construction is to "clarify and when necessary explain what the patentee covered by the claims," not to make things more confusing).

First, a POSA would readily understand this term in the context of the claims and in the context of the field of the invention: computer systems. Ex. 1 ¶¶ 30-31. As such, there is no need for the Court to construe these terms. *See Phillips*, 415 F.3d at 1314.

Second, Citrix's proposed construction, which is based on definitions from general purpose dictionaries, Dkt. 91-1 at 1, is unrelated to the field of the invention and injects into the claims the idea of "place" that does not have a basis in computer systems. Ex. 1 ¶ 31. Adopting Citrix's proposed construction for these terms would only serve to confuse the jury, which is unhelpful. *See U.S. Surgical*, 103 F.3d at 1568.

Additionally, Citrix's proposed construction contradicts the intrinsic evidence, including the intrinsic evidence cited by Citrix regarding the "instruction interception module" term (Term #9). In the Asserted Claims what is being "intercepted" is always some form of "instructions" or "graphics instructions." *See* Ex. 2 at claims 1, 21 ("intercepting a first set of instructions for said graphics processor module"); Ex. 3 at claims 1, 14 ("intercepting graphics instructions outputted

---

[2] '147 patent claims 1, 21; '192 patent claims 1, 14; '285 patent claims 1, 13, 27.
[3] '922 patent claims 3, 7, 15, 19, 27, 31, 37, 41; '146 patent claims 13, 14, 31; '285 patent claims 1, 11, 13, 27; '621 patent claim 4.

by graphics generating software"); Ex. 7 at claim 1 ("intercepting processor instructions by the instruction interception module"), claims 13, 27 ("intercepting a [first set / second set] of processor instructions from a [first / second] graphics generating computer program by the instruction interception module"). Citrix's proposed construction implies that every instruction that is intercepted is stopped and does not continue on to a destination GPU/processing device. Ex. 1 ¶¶ 31-32. Contrary to Citrix's proposed construction, in the '147 patent instructions that are intercepted may be sent on to the GPU/processing device with or without modification or adjustment. *See, e.g.*, Ex. 2 at 9:1-17 ("instruction interception muddle feeds … graphics processors"), 10:1-16 ("instruction interception module" is designed to "feed the same 3D scene instructions to a subsidiary graphics processor"), 13:21-34 ("instruction interception function feeding instructions to a subsidiary graphics processor module"), 15:44-61. Citrix itself cites the same intrinsic evidence regarding the "instruction interception module." Dkt. 91-1 at 10. Citrix's proposed construction, based on extrinsic evidence, should be rejected as it is contrary to the intrinsic evidence. *See, e.g.*, *Phillips*, 415 F.3d at 1314–17.

The terms "intercepting" and "intercepted" do not require any additional construction and Citrix's proposed construction would only confuse the jury and should be rejected.

**B.    Term #2:    "graphics instruction modification module (GIMM)"[4]**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not governed by 35 U.S.C. § 112(6).<br>Alternatively, if governed by 35 U.S.C. § 112(6):<br><br>Function: modifying graphics instructions<br>Structure: software or hardware configured to implement the algorithms disclosed at '147 patent, 5:11-6:3, 6:40-45, 6:53-63, 7:38-41, 7:54-67, 9:1-18, 9:59-66, 10:1-16, 11:21-63, 12:35-45, 12:48-54, 13:21-34, 15:49-16:4, 17:1-18, 17:39-18:26, 18:34-45, 19:14-19, 19:57-60, 20:9-15, 20:38-40, 20:44-47 and/or Figs. 1, 6, 9 and equivalents | Construe pursuant to pre-AIA 35 U.S.C. § 112 paragraph 6.<br><br>Function: modifying graphics instructions<br><br>Structure: software configured to implement the algorithms disclosed at (i) '147 patent, 10:1-16, 11:21-63, 12:35-45 and 12:48-54 or 17:46-18:17; and (ii) 15:53-61; and equivalents thereof. |

---

[4] '490 patent claims 1,11.

| thereof. | |
|---|---|

### 1.  The Term "graphics instruction modification module" Is Not Governed by § 112, ¶ 6.

As with many of the terms, since this term does not use the word "means" there is a presumption that § 112, ¶ 6 does not apply. *Williamson*, 792 F.3d at 1348.  In addition, the claim itself recites sufficient structure for performing the claimed function and, as such, Citrix cannot overcome the presumption that § 112, ¶ 6 does not apply. *Id*.

As a threshold matter, the term "graphics instruction modification module" is not a nonce word. Rather, it is a structural term that connotes sufficient structure to a POSA for performing the claimed function and, as such, does not invoke § 112, ¶ 6. Ex. 1 ¶¶ 35-37. Courts have routinely held that module terms that are modified with a preceding adjective connote structure and are therefore not governed by § 112, ¶ 6. For example, in *Barkan Wireless Access Tech., L.P., v. Cellco Partnership*, the Court held that the term "AP module" was structural and that § 112, ¶ 6 did not apply. No. 2:16-CV-293-JRG-RSP, 2017 WL 2099565, at *16 (E.D. Tex. May 14, 2017). Specifically, the Court held that "the modifier 'AP' provides structural meaning to this 'module' term" and "limits the disputed term to a particular class of structures." *Id*. Similarly, in *Intellectual Ventures II LLC v. Fedex Corp.*, the Court held that the terms "position module" and "communication module" were structural terms and that § 112, ¶ 6 did not apply. No. 2:16-cv-00980-JRG, 2017 WL 5896180, at *40 (E.D. Tex. Nov. 29, 2017).

In the present case, the term "graphics instruction modification module (GIMM)" is a structural term that, when read in light of the intrinsic evidence, connotes sufficient structure to one of ordinary skill in the art for performing the claimed function of modifying graphics instructions. Ex.1 ¶¶ 35-37. For example, claims 1 and 11 of the '490 patent indicate that the GIMM modifies at least one unmodified graphics instruction to create at least one modified

graphic instruction. Ex. 9 at claims 1, 11. The claims go on to specifically define what the process of modifying entails, stating: "the step of modifying comprises at least one action selected from a list consisting of adding at least one graphics instruction, removing at least one of the graphics instructions, replacing at least one of the graphics instructions and any combination thereof." *Id*. The claims then indicate that the "step of modifying facilitates the generation of the compressed image data transmission." *Id*.

In other words, the claims themselves describe the graphics instruction modification module sufficiently to move it out of the means-plus-function ambit, since sufficient structural meaning is conveyed to a POSA. Ex. 1 ¶¶ 35-37. Based on the foregoing, claims 1 and 11 of the '490 patent recite sufficient structure—the claimed "graphics instruction modification module (GIMM)"—for performing the claimed function of "modifying graphics instructions." *Id*. As a result, § 112(6) does not apply and the inquiry should end.

## 2.    In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure.

To the extent the Court determines that the term "graphics instruction modification module (GIMM)" is governed by § 112, ¶ 6, which it should not, the parties agree on the corresponding function being "modifying graphics instructions." In terms of the corresponding structure, T5.2 proposes that the corresponding structure is:

> software or hardware configured to implement the algorithms disclosed at '147 patent, 5:11-6:3, 6:40-45, 6:53-63, 7:38-41, 7:54-67, 9:1-18, 9:59-66, 10:1-16, 11:21-63, 12:35-45, 12:48-54, 13:21-34, 15:49-16:4, 17:1-18, 17:39-18:26, 18:34-45, 19:14-19, 19:57-60, 20:9-15, 20:38-40, 20:44-47 and/or Figs. 1, 6, 9 and equivalents thereof.

Ex. 1 ¶¶ 38-42. As shown above, the parties agree in many respects on the structure that corresponds to the claimed functions (the underlined portions overlap between the parties' positions). T5.2's proposed structure differs in two respects.

First, it makes clear that the structure can be "software or hardware." This is consistent with the intrinsic evidence, which indicates that the "graphics instruction modification module (GIMM)," including the function of "modifying graphics instructions," can be implemented as software or hardware. *See, e.g.*, Ex. 2 at Abstract, 6:21-33, 7:38-41, 9:1-18.

Second, T5.2's proposed construction identifies additional portions of the patent specification that correspond to the structure that performs the claimed functions. *See* 35 U.S.C. § 112, ¶ 6 (if a claim is governed by § 112, ¶ 6 it "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof").

**C.**   **Term #3:**   **"instructions for said graphics processor module"[5] / "graphics instruction(s)"[6] / "instructions for generating a first frame"[7] / "instructions for generating a second frame"[8]**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary. | instructions to cause a [graphics] processor [module] to perform an operation that results in the generation of [a first/second frame of] graphics data such as pixels |

These "instructions" terms are also readily understandable, unambiguous, and do not require construction. A jury would be able to understand these terms in the context of the claims.

Citrix's proposed construction for these terms is redundant of the claim language, which already involve the generation of graphics data. *See, e.g.*, Ex. 2 at claims 1, 21 ("instructions for said graphics processor module" are processed "to generate first graphics data" and "to generate second graphics data"); Ex. 3 at claims 1, 14 ("processing the graphics instructions … to generate graphics data"); Ex. 5 at claims 1, 13 ("processing at least one of the graphics instructions to

---

[5] '147 patent claims 1, 21.
[6] '192 patent claims 1, 2, 3, 14, 15, 18; '922 patent claims 1, 3, 4, 6, 7, 11, 13, 15, 16, 18, 19, 23, 25, 27, 31, 32, 34, 35, 37, 41, 42, 44; '146 patent claims 1, 9, 13, 14, 15, 16, 18, 24, 25, 26, 27, 31, 32, 34, 36, 37, 38, 39, 40, 41, 42, 43; '621 patent claims 1, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14; '490 patent claims 1, 7, 10, 11; '285 patent claim 1.
[7] '568 patent claims 1, 2, 4, 11.
[8] '568 patent claims 1, 4, 11.

generate first graphics data" and "processing at least a second of the graphics instructions to generate second graphics data"), claims 25, 35 ("processing at least one of the [first set / second set] of  modified graphics instructions or at least [one / one other] of the outputted graphics instructions to generate [first / second] graphics data"); Ex. 6 at claim 1 ("processing at least one of the outputted graphics instructions to generate a plurality of pixels"), claim 18 ("processing at least one of the outputted graphics instructions … to generate a [first/second] plurality of pixels"); Ex. 8 at claim 1 ("processing … at least one graphics instruction … to generate a [first / second] plurality of pixels"); Ex. 9 at claims 1, 11 ("processing at least one of the first set of unmodified graphics instructions or at least one of the modified graphics instructions or a combination thereof by the GPU to generate a plurality of pixels"); Ex. 4 at claim 1 ("processing at least part of the [first set / second set] of instructions by the GPU to produce the [first frame / second frame]"). In other words, Citrix's proposed construction does not add any clarity because it is redundant of the language already in the claims. Ex. 1 ¶ 44.

Second, Citrix's proposed construction is overly restrictive and inconsistent with the language of the claims. Ex. 1 ¶ 45. For example, Citrix's proposed construction seeks to limit the claimed "instructions" terms to only those used to generate graphics data such as a frame or pixels. However, the claims indicate that the claimed graphics instructions are also used to generate compression assistance data. *See, e.g.*, Ex. 2 at claims 1, 15, 16, 21, 22, 24. In other words, Citrix's proposed construction, which seeks to limit the use of the claimed instructions to only the generation of graphics data, is inconsistent with the plain language of the claims, which indicate that the instructions can also be used to assist with the generation of the claimed compression assistance data. Ex. 1 ¶ 45; *see also Phillips*, 415 F.3d at 1315 (the patent specification, including the claims, "is the single best guide to the meaning of a disputed term); *In re Power Integrations,*

*Inc.*, 884 F.3d 1370, 1377 (Fed. Cir. 2018) (rejecting construction that was "inconsistent with . . . the plain claim language"); *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1357 (Fed. Cir. 2013) (rejecting construction that was "inconsistent with the surrounding claim language"). The plain and ordinary meaning of these terms is preferable because a POSA would understand these terms to be simply what is described, instructions that tell what a processor/GPU is supposed to do, rather than Citrix's overly restrictive proposed construction. Ex. 1 ¶ 46.

These "instructions" terms do not require construction and Citrix's attempt to improperly rewrite the claims should be rejected.

**D.    Term #4:    "graphics data"[9]**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary. | pixels or other image elements that create individual frames in a video stream and other elements |

The term "graphics data" is also readily understandable, unambiguous, and does not require construction. A jury would be able to understand this term in the context of the claims. Citrix's proposed construction, which simply repeats what is already stated in the claims, not only fails to provide clarity, it creates ambiguity.

First, Citrix's proposed construction is again redundant of the claim language, which already states that the claimed "graphics data" includes image frames, image elements, and/or pixels. *See, e.g.*, Ex. 2, claims 1, 21 ("said first graphics data comprising image frames"); Ex. 3, claims 1, 14 ("graphics data comprising one or more image elements"); Ex. 5, claims 1, 13, 25, 35 ("[first/second] graphics data comprising a [first/second] plurality of pixels"); Ex. 1 ¶ 48. This redundancy, when compared with the claim language and the parties' agreed construction (e.g., the parties' agreed construction of "frame"), would inject further ambiguity into the claims, rather

---

[9] '147 patent claims 1, 13, 17, 20, 21, 22, 25; '192 patent claims 1, 14; '922 patent claims 1, 4, 6, 13, 16, 18, 25, 32, 35, 42.

than clarity. Ex. 1 ¶¶ 48, 50. For example, if Citrix's proposed construction were adopted, '147 patent, claim 21, limitation (b) would require: "said first pixels or other image elements that create individual frames in a video stream and other elements comprising single images that can be displayed in sequence with other images to form video." *See* Ex. 2 at 23:21-22. This result does not add clarity to the claim, which is already clear, but rather adds confusion.  Ex. 1 ¶¶ 47-48, 50.

Second, the language of Citrix's proposed construction—"pixels or other image elements that create individual frames in a video stream and other elements"—creates further ambiguity considering what a POSA would have understood from the claim language as informed by the specification of the patents-in-suit. Ex. 1 ¶¶ 49-50. For example, it is unclear whether Citrix's proposed construction would include specific embodiments disclosed in the specification such as a "texel" as described in Fig. 4 and associated text.  Ex. 2 at Fig. 4, 13:60-15:26; Ex. 1 ¶ 49. Likewise, Citrix's construction raises questions regarding whether it includes only "pixel colors" or also includes pixel values disclosed in the specification that are not colors of the pixels. *See e.g.*, Ex. 2 at 14:1-3 ("data that could be used are the object vertices, the texels that form the surface of an object, or the variables that are used to create or move the polygons or texels"), 11:34-60 (embodiment using 32-bit pixels that include a "unique code for each object/texture combo," an "alpha [value] used to denote transparency," and screen coordinates "(variation of texture in the x axis) [and] (variation of texture in the y axis)"); *see also* Ex. 1 ¶¶ 49-50.

In sum, the term "graphics data" does not require construction and Citrix's attempt to improperly rewrite the claims in an ambiguous and redundant manner should be rejected.

E.      **Term #5:**        **"compression assistance data (CAD)"[10]**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary. | data, such as object identification or motion estimation data, that is derived from graphics instructions and that is used to improve the quality or performance of compression |

The term "compression assistance data" is also readily understandable, unambiguous, and does not require construction. A jury would be able to understand this term in the context of the claims. Citrix's proposed construction, however, not only fails to provide clarity, it injects ambiguity and confusion into the claims.

First, a POSA would not understand the term to be limited to only data used to "improve the quality or performance of compression" as stated in Citrix's proposed construction. Ex. 1 ¶¶ 51-54. Citrix's proposed construction reads the additional limitations of "improve the quality or performance" into the term "assistance," which is not so limited. *Id.* A POSA would have understood "compression assistance data" according to its plain and ordinary meaning, i.e., data that is used to assist compression in any manner, not only those resulting in improved quality or performance. *Id.* Indeed, the claim language indicates that "compression assistance data" is just as it states, data used to assist with compression. *See, e.g.,* Ex. 2 at claims 1, 21, 22 (compression assistance data is used to generate a compressed video signal); Ex. 5 at claims 1, 13, 25, 35 (same); Ex. 6 at claims 1, 18 (same); Ex. 7 at claims 1, 5, 7, 8, 13, 18, 21, 23 (compression assistance data is used to generate compressed image data). The claim language does not limit compression assistance data to only data "used to improve the quality or performance of compression" as Citrix contends. Ex. 1 ¶ 52.

Further, the specification describes examples of compression assistance data, at no point

---

[10] '147 patent claims 1, 21, 22; '192 patent claims 1, 14, 18; '922 patent claims 1, 3, 7, 12, 13, 15, 19, 24, 25, 27, 31, 33, 35, 37, 41, 43; '146 patent claims 1, 13, 14, 18, 31; '285 patent claims 1, 5, 7, 8, 13, 18, 21, 23.

limiting the scope of this data to only data "used to improve the quality or performance of compression." For example, the '147 patent states:

> According to preferred embodiments of the invention, compression assistance data includes motion vector data. Some examples of other types of compression assistance data which may be provided when encoding images with MPEG4 data compression are:
>
>> which parts of a scene—if any—to encode as separate objects (as there is a maximum number)
>> what form of encoding to use on the objects
>> whether to encode the shapes as transparent objects or solids
>> how often to transmit full images rather than simply changes from a previous image (as there is a trade-off between error corrections and bandwidth)
>> whether or not to use overlapped motion estimation.
>
> The criteria used in making these decisions include:
>
>> processing time/effort required to make an analysis the bandwidth 'budget' left
>> minimum image quality constraints.

Ex. 2 at 4:38-55. The '147 patent goes on to describe "compression assistance data" as "data used for compression, e.g., motion vectors." *Id.* at 15:60-61. Once again, the term is not limited to only data "used to improve the quality of performance or compression." As a result, a POSA would understand that the term "compression assistance data" is not limited to only data "used to improve the quality or performance of compression" as contended by Citrix. Ex. 1 ¶¶ 53-54.

Second, Citrix's proposed construction injects a subjective element into the claims, requiring a determination as to whether the compression assistance data is being used to improve the quality or performance of compression (or whether the result of the process amounts to an improvement in quality or performance, as opposed to offering other advantage(s)). Ex. 1 ¶¶ 55-56. This statement of intended purpose is subjective and only serves to inject ambiguity into the claims, rather than clarity, *id.*, which is contrary to one of the fundamental purposes of claim construction. *See U.S. Surgical*, 103 F.3d at 1568 (purpose of claim construction is to "clarify and when necessary explain what the patentee covered by the claims," not to make things more

confusing).  The Federal Circuit has consistently rejected claim constructions that seek to introduce

a subject element into the claims.  *See, e.g.*, *Stryker Corp. v. Zimmer Inc.*, No. 1:10-CV-1223, 2012

WL 12883650, at *3 (W.D. Mich. Nov. 29, 2012) (citing Federal Circuit cases);  *see also*

*ContentGuard Holdings, Inc. v. Amazon.com, Inc.*, No. 2:13-CV-1112-JRG, 2015 WL 1289321,

at *73 (E.D. Tex. Mar. 20, 2015) (rejecting construction that would "introduce a potentially

subjective element that would tend to confuse rather than clarify the scope of the claims").

The subjective nature of the inquiry created by Citrix's proposed construction is further

highlighted by the criteria identified in the intrinsic evidence that may be used to determine what

types of compression assistance data to use. Ex. 1 ¶ 56. For example, the '147 patent indicates

example criteria that can be used to determine the type(s) of compression assistance data to use

include "processing time/effort required to make an analysis," "the bandwidth 'budget' left," and

"minimum image quality constraints."  Ex. 2 at 4:52-55. Injecting Citrix's subjective requirement

into the claims would create additional confusion because it would be unclear whether use of the

compression assistance data must result in an improvement in all criteria identified, only some

criteria identified, or other criteria not identified. Ex. 1 ¶ 56.

In sum, the term "compression assistance data" does not require additional construction and

Citrix's attempt to improperly rewrite the claims in an ambiguous and redundant manner should

be rejected.

F.    **Term #6:**    **"wherein handshake signalling is provided between the encoder and a least one other step"[11]**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary. | Indefinite. |

Citrix contends this term or phrase is indefinite. To show indefiniteness, Citrix must "show

---

[11] '192 patent claims 9, 17.

by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010). A claim is invalid for indefiniteness only when its language, read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Id.* "The certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter." *Id.* "In the face of an allegation of indefiniteness, general principles of claim construction apply." *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010) (internal quotation marks and citation omitted). Citrix cannot meet its burden.

Assuming Citrix contends that the term "handshake signalling" is indefinite (the basis of Citrix's indefiniteness contention is unclear), a POSA would understand the meaning of "handshake" as it is a well-understood term in computer systems regarding the coordination of processes between components. Ex. 1 ¶ 57. The '192 patent further informs the meaning of the term by explaining that a "handshake signalling" is used to "co-ordinate the process" using an exchange of signals between the encoding function and the instruction interception module. *See* Ex. 3 at 6:43-45, 10:61-63 ("Handshake signalling may be used between the encoding function and the instruction interception module to co-ordinate the process."). An embodiment in the '192 patent found in Figure 6 shows a handshake signal (88) as a bidirectional exchange of signals between the CPU (72) and the DSPU (84).



Fig. 6

Ex. 3, Fig. 6; *see also id.* at 6:2-4 ("Handshake signalling 88 between the DSP 88 and the CPU 72 is used for quality control if there is congestion on the network."). When read in light of the specification, "handshake signalling" informs a POSA of the scope of the invention. Ex. 1 ¶ 57.

Further, the term "handshake" appears in computer dictionaries, which confirms that it is a well-known term to a POSA. Ex. 1 ¶ 57; *see also, e.g.*, Dkt. 91-1 at 5 ("A series of signals acknowledging that communication or the transfer of information can take place between computers or other devices.") (Citrix quoting Microsoft Computer Dictionary Fifth Ed. at 225-226). Accordingly, the term "handshake" is well-known to a POSA and is not indefinite.

G.    **Term #7:**    **"motion vector"**[12]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary. | offset between the location of a block of pixels in consecutive frames |

The term "motion vector" is also readily understandable, unambiguous, and does not require construction. To the contrary, Citrix's proposed construction excludes certain motion vectors described in the specification and does not provide any additional clarity. First, a POSA would not understand the term to be limited to an offset between the location of a block of pixels in consecutive frames. Ex. 1 ¶¶ 58-59. The '146 patent describes various types of motion vectors.

---

[12] '922 patent claims 8, 21, 22, 26, 30, 36, 40; '146 patent claims 3, 10, 20, 28, 35; '621 patent claim 3.  Citations to the '146 patent are exemplary for the '922 and '621 patents.

*See, e.g.*, Ex. 6 at 12:15-21 (object motion vectors), 20:30-32 (pixel-based motion vectors). Citrix's proposed definition incorrectly excludes these motion vectors. Ex. 1 ¶ 59. Second, Citrix's extrinsic evidence explains that the plain and ordinary meaning of motion vector also includes "[a] vector displacement representing the translation of a *pixel*, block, *or region* between two frames of video" and explains that vectors can be assigned on a pixel by pixel basis. Dkt. 91-1 at 6(emphasis added); Ex. 1 ¶ 60. Citrix's proposed definition incorrectly excludes these motion vectors. Ex. 1 ¶ 60. Citrix's proposed construction should be rejected.

**H.**  **Term #8:**  **"wherein the step of identifying an a comprises at least one step selected from a group consisting of identifying the type of one of the outputted graphics instructions, identifying the contents of one of the outputted graphics instructions and any combination thereof"[13]**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary. | Indefinite. |

At the outset, a party may not seek to invalidate a claim as indefinite without disclosing such contention in its invalidity contentions. *Silicon Labs., Inc. v. Cresta Tech. Corp.,* No. 14-CV-03227-PSG, 2016 WL 791792, at *3 (N.D. Cal. Mar. 1, 2016) (denying summary judgment where indefiniteness theory not disclosed in invalidity contentions as to certain challenged terms); *see also MorphoTrust USA, LLC v. United States*, 132 Fed. Cl. 419, 420 (2017) (in the absence of Local Patent Rules, denying leave to amend to add indefiniteness assertions against seven terms not disclosed in invalidity contentions). Citrix's invalidity contentions fail to disclose its contention that claims 26, 37 and 41 of the '146 patent are indefinite, which is fatal to its claim of indefiniteness as to these claims. Ex. 10, Citrix's Inv. Cont. at 138-142. The Court may deny Citrix's claim of indefiniteness as to claims 26, 37 and 41 on this ground alone. *Silicon Labs.*, 2016 WL 791792 at *3; *MorphoTrust USA*, 132 Fed. Cl. at 420.

---

[13] '146 patent claims 26, 34, 37, 41.

The basis for Citrix's contention that this term is indefinite is unclear. A POSA would understand the meaning of all the words in this phrase as are all well-understood. Ex. 1 ¶ 61.

To the extent Citrix contends this phrase lacks antecedent basis, Citrix's argument fails. The requirement that each claim term have an antecedent basis is a rule of patent drafting, administered during patent examination. When the meaning of a claim would be "reasonably ascertainable by those skilled in the art, then the claim is not indefinite" due to lack of antecedent basis. *See Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370–71 (Fed. Cir. 2006); *see also In re Downing*, 754 Fed. App'x 988, 996 (Fed. Cir. 2018). A claim term is not invalid for indefiniteness if its antecedent basis is present by implication. *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1319 (Fed. Cir. 2005). To the extent Citrix argues these dependent claims lack an antecedent basis, a POSA would understand that antecedent basis is present directly and by implication because there is only one "identifying" step in claim 18 of the '146 patent (the independent claim), which is "c) identifying at least one of the outputted graphics instructions having an influence on a co-ordinate associated with the image data." Ex. 1 ¶ 62; Ex. 6 at 22:45-47. A POSA further would understand that "at least one of the outputted graphics instructions having an influence on a co-ordinate associated with the image data" is an attribute to which "wherein the step of identifying an attribute" refers in claims 26, 34, 37 and 41 of the '146 patent. Ex. 1 ¶ 62.

## I.    Term #9:    "an instruction interception module"[14]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not governed by 35 U.S.C. § 112(6).<br>Alternatively, if governed by 35 U.S.C. § 112(6):<br><br>Function: instruction interception<br>Structure: a device driver, wrapper component, or other software or hardware configured to implement the algorithms disclosed at '147 patent, | Construe pursuant to pre-AIA 35 U.S.C. § 112 paragraph 6<br><br>Function:  instruction interception<br><br>Structure:   a  device  driver,  DirectX  wrapper function or other software or hardware configured |

---
[14] '285 patent claims 1, 13, 27.

| | |
|---|---|
| 5:8-6:3, 6:40-45, 6:53-63, 7:38-41, 7:54-67, 9:1-18, 9:59-66, 10:1-16, 11:21-63, 12:35-45, 12:48-54, 13:21-34, 15:49-61, 17:1-18, 17:39-18:26, 18:34-45, 19:14-19, 19:57-60, 20:9-15, 20:38-40, 20:44-47 and/or Figs. 1, 6, 9 and equivalents thereof. | to implement the algorithms disclosed at (i) '147 patent, 9:1-18, 10:1-16, and 13:21-34; or (ii) the algorithm disclosed at 15:49-57; and equivalents thereof. |

### 1. The Term "instruction interception module" is Not Governed by § 112, ¶ 6.

The term "instruction interception module" is a structural term that, when read in light of the intrinsic evidence, connotes sufficient structure to one of ordinary skill in the art for performing the claimed function of "instruction interception."  Ex. 1 ¶¶ 63-64.

Courts have routinely held that module terms that are modified with a preceding adjective connote structure and are therefore not governed by § 112, ¶ 6. *Barkan Wireless*, 2017 WL 2099565 at *16; *Intellectual Ventures II*, 2017 WL 5896180 at *40. In *Genband USA LLC v. Metaswitch Networks, Ltd.*, the Court rejected Metaswitch's argument and held that the term "telecommunications interface module" was structural and that § 112, ¶ 6 did not apply. No. 2:14-cv-33-JRG-RSP, 2015 WL 4722185, at *13 (E.D. Tex. Aug. 7, 2015). The Court noted that "the 'prefix' that appears before a purported nonce word may impart structural meaning." *Id.* The Court further noted that "the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.*[15]

The term "instruction interception module" is a structural term used in common parlance by a POSA as of the priority date to designate structure. Ex. 1 ¶¶ 63-64; *see also Dyfan*, 28 F.4th

---

[15] *See also Alacritech, Inc .v. Century Link Communications LLC,* 271 F.Supp.3d 850 (E.D. Tex. 2017) (finding that term "packet batching module" connotes structure and is therefore not governed by § 112, ¶ 6); *S3G Tech., LLC v. UniKey Tech., Inc.*, No. 6:16-cv-400-RWS- KNM, 2017 WL 5178837 (E.D. Tex. July 7, 2017) (finding that the term "dialogue module" connotes structure and is therefore not governed by § 112, ¶ 6).

at 1366. Further, when read in light of the intrinsic evidence, the term "instruction interception module" connotes sufficient structure to a POSA for performing the claimed function of instruction interception. Ex. 1 ¶¶ 63-64. For example, the '147 patent indicates that the "instruction interceptor," or instruction interception module 11, 74, may be a "device driver," or it may be a "wrapper component," or "an addition to existing middleware" for, e.g., DirectX or OpenGL. Ex. 2 at 5:8-10, 9:8-12. The '147 patent describes the role of the instruction interception module in one embodiment as follows:

> With reference to FIG. 1, a system for interactive applications in accordance with the present invention **10** has an instruction interception module **11**, a main graphics processor **12**, a subsidiary graphics processor **13** responsive to the instruction interception module, and an encoder **14** responsive to the graphics processors. In this embodiment the encoder is a DSP, alternatively the encoder may be a graphics processor, any CPU, or other processing device. In this embodiment the instruction interception module is a device driver, alternatively the instruction interception module is an addition to existing middleware, such as DirectX™ or OpenGL™. In this embodiment, one instruction interception module feeds two graphics processors, but in another embodiment, there may be more than one instruction interception module, e.g. one per graphics processor. The main graphics processor and the subsidiary graphics processor are graphics processor modules. They may be separate hardware units, or separate processes executed on one hardware unit.

*Id.* at 9:1-18. The '147 patent further indicates that the "instruction interception module 11 feeds a subsidiary graphics processor" and that "the direct feed-forward path 15 from the instruction interception module to the encoder could be used to allow the encoder to detect complete scene changes." *Id.* at 9:59-61, 10:33-35. In this latter instance, "that scene should not be compressed as a difference from the previous image (temporal compression) as the differences would be too great." *Id.* at 10:36-39. The '147 patent goes on to state:

> The game program sends a first set of graphics instructions to a first graphics processing unit (GPU1) **76** which is intercepted by an instruction interception module **74**, which may be embodied as a software wrapper or hardware form. The first set of instructions, including vertex data, transformation data and texture data are passed to GPU1 **76** whilst a specially manipulated version of the instructions is generated and passed to a second graphics processing unit (GPU2) **78**.

*Id.* at 15:49-57; *see also id.* at Figs. 1, 6 (and accompanying descriptions). The term "instruction

24

interception module" is accompanied by a detailed description of its operation to move it out of the means-plus-function ambit, since sufficient structural meaning is conveyed to a POSA. Ex. 1 ¶¶ 63-64.

**2.      In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure.**

To the extent the Court determines that the term "instruction interception module" is governed by § 112, ¶ 6, which it should not, the parties agree on the corresponding function being "instruction interception." In terms of the corresponding structure, T5.2 proposes that the corresponding structure is:

> a device driver, wrapper component, or other software or hardware configured to implement the algorithms disclosed at '147 patent, 5:8-6:3, 6:40-45, 6:53-63, 7:38-41, 7:54-67, 9:1-18, 9:59-66, 10:1-16, 11:21-63, 12:35-45, 12:48-54, 13:21-34, 15:49-61, 17:1-18, 17:39-18:26, 18:34-45, 19:14-19, 19:57-60, 20:9-15, 20:38-40, 20:44-47 and/or Figs. 1, 6, 9 and equivalents thereof.

Ex. 1 ¶¶ 65-69. As shown above, the parties agree in many respects on the structure that corresponds to the claimed functions (the underlined portions overlap between the parties' positions). T5.2's proposed structure differs in two respects. First, it makes clear that the wrapper is not limited to a "DirectX wrapper function," but can be any wrapper component. This is consistent with the intrinsic evidence, which indicates that the wrapper can be any wrapper component (not function, as Citrix suggests) and is not limited to a particular type. *See, e.g.*, Ex. 2 at 5:8-10, 8:9-21, 15:49-53. Citrix's attempt to read a limitation from the specification, DirectX, into the claim language is inappropriate and contrary to law as other application programming interfaces are also suitable for intercepting processor instructions. *See Phillips*, 415 F.3d at 1320; Ex. 1 ¶¶ 65-69; Ex. 2 at 9:1-18. Second, T5.2's proposed construction identifies additional portions of the patent specification that correspond to the structure that performs the claimed functions. *See* 35 U.S.C. § 112, ¶ 6.

**J.      Term #10: "compression assistance instructions"[16]**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary. | information, such as object identification or motion estimation data, that is derived from graphics instructions and that is used to improve the quality or performance of compression |

The term "compression assistance instructions" is also readily understandable, unambiguous, and does not require construction. A jury would be able to understand this term in the context of the claims. Citrix's proposed construction injects ambiguity and confusion into the claims, which is not helpful.

Citrix's proposed construction is the same here as it is for "compression assistance data" (Term #5). This term only appears in the '285 patent, but its use mirrors the use of "compression assistance data." *See* Ex. 1 ¶ 70; Ex. 7 at claim 1 ("generating compression assistance data (CAD) or compression assistance instructions (CAI) or a combination thereof"), claim 13 (same). For the same reasons discussed above regarding Term #5, "compression assistance instructions" does not require construction and Citrix's proposed construction should be rejected.

**K.      Term #11: "a transmission module"[17]**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not governed by 35 U.S.C. § 112(6). Plain and ordinary meaning. No construction necessary.<br><br>If governed by 35 U.S.C. § 112(6):<br><br>Function: transmitting compressed image data<br><br>Structure: software or hardware configured to implement the algorithms disclosed at: '490 patent, 1:62-65; 2:13-16; 2:27-31; 2:37-44; 2:56-61; 3:1-4; 15:67-16:3; 16:7-12; 16:36-39; Fig. 5, and equivalents thereof. | Construe pursuant to pre-AIA 35 U.S.C. § 112 paragraph 6<br><br>Function: transmitting compressed image data<br><br>Structure:  network interface 70 in Fig. 6, *i.e.* an interface to a data communication network, such as a cable or satellite broadcasting network and/or a public telephone network, as described at '147 patent, 15:28-49; and equivalents thereof. |

---

[16] '285 patent claims 1, 13, 18, 21, 23.
[17] '490 patent claims 1, 11.

1. **The Term "a transmission module" is Not Governed by § 112, ¶ 6.**

As this term does not use the word "means" there is a presumption that § 112, ¶ 6 does not apply. *Williamson*, 792 F.3d at 1348. The term "a transmission module" is a structural term that, when read in light of the intrinsic evidence, connotes sufficient structure to one of ordinary skill in the art for performing the claimed function of "transmitting compressed image data." Ex. 1 ¶¶ 71-76; *Id.*; *Entrust Datacard Corp. v. Atl. Zeiser GmbH*, No. 3:17-CV-110-J-39MCR, 2018 WL 3599217, at *10 (M.D. Fla. June 29, 2018). Thus, § 112, ¶ 6 does not apply and the inquiry should end. *See Phillips*, 415 F.3d at 1314.

2. **In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure.**

If the Court determines that the term "a transmission module" is governed by § 112, ¶ 6, the parties agree on the corresponding function being "transmitting compressed image data." In terms of the corresponding structure, T5.2 proposes that the corresponding structure is:

> software or hardware configured to implement the algorithms disclosed at: '490 patent, 1:62-65; 2:13-16; 2:27-31; 2:37-44; 2:56-61; 3:1-4; 15:67-16:3; 16:7-12; 16:36-39; Fig. 5, and equivalents thereof.

Ex. 1 ¶¶ 79-81. T5.2's proposed structure differs from Citrix's in two respects.

First, it makes clear that the structure can be "software <u>or</u> hardware." This is consistent with the intrinsic evidence, which indicates that the transmission module, can be implemented as software or hardware. *See, e.g.*, Ex. 9 at 2:13-16 (connection to "broadband telecommunications network, such as Digital Subscriber Line (DSL ), cable or third generation (3G) wireless network"), 2:56-61 ("connection to a broadband network which may be to the home, office or via e.g. a 3G or "WiFi" wireless network, to a mobile device"), 15:67-16:3 ("data communications networks"), 16:7-12; 16:36-39 ("and passes the resulting compressed video stream 86 to the CPU 72 for transmission across the network 54"). A POSA would understand that each of these network

interfaces would be hardware and/or software. Ex. 1 ¶¶ 79-81. And a POSA would understand that Figure 6's identification of a network interface is also an example of these types of connections. Ex. 1 ¶¶ 79-81. To the extent that Citrix seeks to limit the types of transmissions that could occur via these structures to the types in its extrinsic evidence, this is overly restrictive. A POSA would also understand that the plain and ordinary meaning of transmit would be to send the compressed image data at issue via the various structures T5.2 has identified, including but not limited to in the manners described by Citrix's extrinsic evidence. Ex. 1 ¶¶ 79-81. Second, T5.2's proposed construction identifies additional portions of the patent specification that correspond to the structure that performs the claimed functions. *See* 35 U.S.C. § 112, ¶ 6; Ex. 1 ¶¶ 79-81.

**L.      Term #12:**     **"an instruction interceptor capable of intercepting a first set of instructions for said graphics processor module, said first set of instructions relating to how to render image frames, and generating an output comprising a second set of instructions for said graphics processor module"[18]**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not governed by 35 U.S.C. § 112(6). Plain and ordinary meaning. No construction necessary.<br><br>Alternatively:<br><br>If governed by 35 U.S.C. § 112(f):<br>Function: intercepting a first set of instructions for said graphics processor module, said first set of instructions relating to how to render image frames, and generating an output comprising a second set of instructions for said graphics processor module.<br><br>Structure: a device driver, wrapper component, or other software or hardware configured to implement the algorithms disclosed at '147 patent, 5:8-6:3, 6:40-45, 6:53-63, 7:38-41, 7:54-67, 9:1-18, 9:59-66, 10:1-16, 11:21-63, 12:35-45, 12:48-54, 13:21-34, 15:49-61, 17:1-18, 17:39-18:26, 18:34-45, 19:14-19, 19:57-60, 20:9-15, 20:38-40, 20:44-47 and/or Figs. 1, 6, 9 and equivalents thereof. | Construe pursuant to pre-AIA 35 U.S.C. § 112 paragraph 6.<br><br>Function:  intercepting a first set of instructions for said graphics processor module, said first set of instructions relating to how to render image frames, and generating an output comprising a second set of instructions for said graphics processor module<br><br>Structure:  a device driver, DirectX wrapper function or other software or hardware configured to implement the algorithms disclosed at (i) '147 patent, 9:1-18, 10:1-16, and 13:21-34; or (ii) the algorithm disclosed at 15:49-57; and equivalents thereof. |

---

[18] Ex. 2, claim 21.

28

### 1.     The Term "an instruction interceptor capable of intercepting …" is Not Governed by § 112, ¶ 6.

This term is not governed by § 112, ¶ 6 for the same reasons as the term "instruction interceptor module" discussed above. *See supra* § VII.I. The term connotes sufficient structure to one of ordinary skill in the art for performing the claimed function of "instruction interception." Ex. 1 ¶¶ 63-65, 82-83. As a result, § 112, ¶ 6 does not apply and the inquiry should end.

### 2.     In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure.

To the extent the Court determines that the term "instruction interceptor capable of intercepting …" is governed by § 112, ¶ 6, which it should not, the parties agree on the corresponding function. T5.2 proposes that the corresponding structure is:

> a device driver, wrapper component, or other software or hardware configured to implement the algorithms disclosed at '147 patent, 5:8-6:3, 6:40-45, 6:53-63, 7:38-41, 7:54-67, 9:1-18, 9:59-66, 10:1-16, 11:21-63, 12:35-45, 12:48-54, 13:21-34, 15:49-61, 17:1-18, 17:39-18:26, 18:34-45, 19:14-19, 19:57-60, 20:9-15, 20:38-40, 20:44-47 and/or Figs. 1, 6, 9 and equivalents thereof.

Ex. 1 ¶¶ 65-69, 84-88. For the same reasons discussed above with respect to Term #9, "instruction interceptor," to the extent the Court determines that this claim term is governed by § 112, ¶ 6, the claim should be construed to cover the structure identified by T5.2. *See supra* § VII.I; *see also* Ex. 1 ¶¶ 65-69, 84-88.

### M.     Term #13: "a processing function capable of processing said first set of instructions or said second set of instructions or a combination thereof in said graphics processor module, said processing function having an output capable of generating first graphics data, said first graphics data comprising image frames"[19]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not governed by 35 U.S.C. § 112(6). Plain and ordinary meaning. No construction necessary.<br><br>Alternatively:<br><br>If governed by 35 U.S.C. § 112(6): | Construe pursuant to 35 U.S.C. § 112 paragraph 6.<br><br>Function:  processing said first set of instructions or said second set of instructions or a combination thereof in said graphics processor module, said |

---

[19] '147 Patent, claim 21.

| Function: processing said first set of instructions or said second set of instructions or a combination thereof in said graphics processor module, said processing function having an output capable of generating first graphics data, said first graphics data comprising image frames.<br><br>Structure: software or hardware configured to implement the algorithms disclosed at '147 patent, 6:34-36, 8:1-8, 9:31-45, 9:62-66, 10:11-16, 10:40-59, 15:53-64, 17:19-18:26, 19:9-30 and/or Figs. 1, 2, 3, 6, 8, 9, 10 and equivalents thereof. | processing function having an output capable of generating first graphics data, said first graphics data comprising image frames<br><br>Structure:  software configured to implement the algorithms disclosed at (i) '147 patent, 9:40-45, 15:53-64, and Fig. 6; or (ii) 17:19-18:26, 15:53-64 and Figs. 6, 8, 9, 10; and equivalents thereof. |

1.   **The Term "a processing function … in said graphics processor module" is Not Governed by § 112, ¶ 6.**

As with the preceding term, since this term does not use the word "means" there is a presumption that § 112, ¶ 6 does not apply. *Williamson*, 792 F.3d at 1348. In addition, the claim itself recites sufficient structure for performing the claimed function and, as such, Citrix cannot overcome the presumption that § 112, ¶ 6 does not apply. *See id.*; *Entrust Datacard Corp.*, 2018 WL 3599217, at *10l.

As a threshold matter, claim 21 of the '147 patent does not claim just any "processing function," but rather "a processing function … in said graphics processor module." In other words, the structure recited in the claim for performing the functions of "processing said first set of instructions or said second set of instructions or a combination thereof" is "a processing function … in said graphics processor module." Ex. 1 ¶¶ 89-96.

The term "processing function … in said graphics processor module" is not a nonce word. Ex. 1 ¶¶ 89-95. Rather, it is a structural term that connotes sufficient structure to a POSA for performing the claimed function and, as such, does not invoke § 112, ¶ 6. Ex. 1 ¶¶ 89-96.  Further, the parties have agreed on a construction for the term "graphics processor module" as "one or more GPUs," and a GPU is a known structural term. Dkt. 91 at 1; Ex. 1 ¶¶ 90-94; Ex. 2 at 2:62-64, 15:44- 16:8. As of the priority date, a graphics processing unit, or GPU, was a structural term that

was used in common parlance by a POSA to designate structure. Ex. 1 ¶¶ 91-94; *see also TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013). This should end the inquiry and Citrix's apparent attempt to divorce the claimed "processing function" from the "graphics processor module" should be rejected. In *Zeroclick, LLC v. Apple, Inc.*, the Federal Circuit also held that the district court erred in treating "'program' and 'user interface code' as nonce words." 891 F.3d 1003, 1008 (Fed. Cir. 2018).

Here, the term "processing function … in said graphics processor module" is a structural term that, when read in light of the intrinsic evidence, connotes sufficient structure to one of ordinary skill in the art for performing the claimed function of "processing said first set of instructions or said second set of instructions or a combination thereof." Ex. 1 ¶¶ 89-96. For example, the '147 patent indicates:

> Preferably, the or each graphics processor module comprises a dedicated graphics processor, typically in the form of a graphics chip. Optionally, two or more dedicated graphics processors are used which are functionally substantially identical.
> Alternatively, the function of more than one graphics processor module may be implemented on a single dedicated graphics processor, for example using a multiple time slice processing scheme.
> A graphics processor module may be shared between one or more compression subsystems. A single dedicated graphics processor may be clocked to render frames at a higher frequency than the final display rate.

Ex. 2 at 6:21-33. In describing the graphics processor module, the '147 patent states:

> With reference to FIG. 1, a system for interactive applications in accordance with the present invention **10** has an instruction interception module **11**, a main graphics processor **12**, a subsidiary graphics processor **13** responsive to the instruction interception module, and an encoder **14** responsive to the graphics processors. In this embodiment the encoder is a DSP, alternatively the encoder may be a graphics processor, any CPU, or other processing device.
> …
> In this embodiment, one instruction interception module feeds two graphics processors, but in another embodiment, there may be more than one instruction interception module, e.g. one per graphics processor. The main graphics processor and the subsidiary graphics processor are graphics processor modules. They may be separate hardware units, or separate processes executed on one hardware unit.

31

*Id.* at 9:1-18. As demonstrated above, the term "processing function … in said graphics processor module" is accompanied by a detailed description of its operation to move it out of the means-plus-function ambit, since sufficient structural meaning is conveyed to a POSA. Ex. 1 ¶¶ 89-96. Thus, § 112, ¶ 6 does not apply and the inquiry should end. *See Phillips*, 415 F.3d at 1314.

If § 112, ¶ 6 does not apply, Citrix makes no argument for an alternative construction. And so, plain and ordinary meaning is appropriate. *See Phillips*, 415 F.3d at 1314.

### 2.   In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure.

To the extent the Court determines that the term "processing function … in said graphics processor module" is governed by § 112, ¶ 6, the parties agree on the corresponding function being "processing said first set of instructions or said second set of instructions or a combination thereof . . . ." In terms of the corresponding structure, T5.2 proposes that the corresponding structure is:

> <u>software</u> or hardware <u>configured to implement the algorithms disclosed at</u> '147 patent, 6:34-36, 8:1-8, 9:31<u>-45</u>, 9:62-66, 10:11-16, 10:40-59, <u>15:53-64, 17:19-18:26</u>, 19:9-30 and/or Figs. 1, 2, 3, <u>6, 8, 9, 10</u> <u>and equivalents thereof</u>.

Ex. 1 ¶¶ 99-100. As shown above, the parties agree in many respects on the structure that corresponds to the claimed functions (the underlined portions overlap between the parties' positions). T5.2's proposed structure differs in two respects. First, it makes clear that the structure can be "software <u>or</u> hardware." This is consistent with the intrinsic evidence, which indicates that the graphics processor module, including the processing functions within the graphics processor module, can be implemented as software or hardware. *See, e.g.*, Ex. 2 at 6:21-33, 9:1-18. This is also consistent with the parties' agreed construction for the term "graphics processor module (GPM)." *See* Dkt. 91 at 1; Ex. 1 ¶ 101. Second, T5.2's proposed construction identifies additional portions of the patent specification that correspond to the structure that performs the claimed functions. *See* 35 U.S.C. § 112, ¶ 6.

**N.    Term #14:    "a processing function capable of processing said second set of instructions in said graphics processor module, said processing function being further capable of producing an output comprising second graphics data"[20]**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not governed by 35 U.S.C. § 112(6). Plain and ordinary meaning. No construction necessary.<br><br>Alternatively:<br><br>If governed by 35 U.S.C. § 112(6):<br><u>Function</u>: processing said second set of instructions in said graphics processor module, said processing function being further capable of producing an output comprising second graphics data.<br><br><u>Structure</u>: software or hardware configured to implement the algorithms disclosed at '147 patent, 5:11-6:9, 6:14-15, 6:40-45, 6:53-63, 7:33-53, 8:1-8, 9:59-66, 10:1-16, 10:21-36, 10:40-59, 11:21-63, 12:35-45, 12:48-15:26, 15:53-64, 16:63-17:36, 17:45-18:26, 18:34-56, 18:63-65, 19:1-30, 20:19-50, 20:54-21:9 and/or Figs. 1, 2, 6, 8, 9, 10 and equivalents thereof. | Construe pursuant to 35 U.S.C. § 112 paragraph 6.<br><br><u>Function</u>:  processing said second set of instructions in said graphics processor module, said processing function being further capable of producing an output comprising second graphics data<br><br><u>Structure</u>:  software configured to implement the algorithms disclosed at '147 patent, 9:62-66 and 10:1-16, 11:21-63, 12:35-45 and 12:48-54, or 17:46-18:17 and Figs. 9, 10; and (ii) 15:53-61; and equivalents thereof. |

**1.    The Term "a processing function … in said graphics processor module" is Not Governed by § 112, ¶ 6.**

This term is not governed by § 112, ¶ 6 for the same reasons as the previous term. *See supra* § IV.N. The term "processing function … in said graphics processor module" is a structural term that, when read in light of the intrinsic evidence, connotes sufficient structure to one of ordinary skill in the art for performing the claimed functions of "processing said second set of instructions" and "producing an output comprising second graphics data." Ex. 1 ¶¶ 102-103. As a result, § 112, ¶ 6 does not apply and the inquiry should end. If § 112, ¶ 6 does not apply, Citrix makes no argument for an alternative construction. Thus, plain and ordinary meaning is appropriate. *See Phillips*, 415 F.3d at 1314.

---

[20] '147 patent, claim 21.

### 2.     In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure.

To the extent the Court determines that the term "processing function … in said graphics processor module" is governed by § 112, ¶ 6, which it should not, the parties agree on the corresponding function being "processing said second set of instructions" and "producing an output comprising second graphics data." In terms of the corresponding structure, T5.2 proposes that the corresponding structure is:

> software or hardware configured to implement the algorithms disclosed at '147 patent, 5:11-6:9, 6:14-15, 6:40-45, 6:53-63, 7:33-53, 8:1-8, 9:59-66, 10:1-16, 10:21-36, 10:40-59, 11:21-63, 12:35-45, 12:48-15:26, 15:53-64, 16:63-17:36, 17:45-18:26, 18:34-56, 18:63-65, 19:1-30, 20:19-50, 20:54-21:9 and/or Figs. 1, 2, 6, 8, 9, 10 and equivalents thereof.

Ex. 1 ¶¶ 106-107. As shown above, the parties agree in many respects on the structure that corresponds to the claimed functions (the underlined portions overlap between the parties' positions). T5.2's proposed structure differs in two respects. First, it makes clear that the structure can be "software or hardware." This is consistent with the intrinsic evidence, which indicates that the graphics processor module, including the processing functions within the graphics processor module, can be implemented as software or hardware. *See, e.g.*, Ex. 2 at 6:21-33, 9:1-18. This is also consistent with the parties' agreed construction for the term "graphics processor module (GPM)." *See* Dkt. 91 at 1; Ex. 1 ¶ 108. Second, T5.2's proposed construction identifies additional portions of the patent specification that correspond to the structure that performs the claimed functions. *See* 35 U.S.C. § 112, ¶ 6; Ex. 1 ¶¶ 106-107.

### O.     Term #15:     "a compression assistance data generator capable of receiving an input comprising said second graphics data and producing an output comprising compression assistance data"[21]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Not governed by 35 U.S.C. § 112(6). Plain and ordinary meaning. No construction necessary. | Construe pursuant to 35 U.S.C. § 112 paragraph 6. |

---

[21] '147 patent, claim 21.

| | |
|---|---|
| Alternatively:<br><br>If governed by 35 U.S.C. § 112(6):<br><br><u>Function</u>: receiving an input comprising said second graphics data and producing an output comprising compression assistance data. <u>Structure</u>: software or hardware configured to implement the algorithms disclosed at '147 patent, 6:4-20, 6:46-7:37, 9:51-61, 10:1-16, 10:21-36, 11:21-13:42, 13:53-15:26, 15:53-64, 16:63-17:36, 17:45-18:26, 18:34-36, 18:46, 19:1-30, 20:19-50, 20:54-21:9 and/or Figs. 1, 2, 6, 8, 9, 10 and equivalents thereof. | <u>Function</u>: receiving an input comprising said second graphics data and producing an output comprising compression assistance data<br><br><u>Structure</u>: software configured to implement the algorithms disclosed at '147 patent: (i) 11:64-12:34, 12:35-47 and 12:55-13:20, or 14:4-15:2; and (ii) 15:58-64; and equivalents thereof. |

### 1.     The Term "a compression assistance generator … " is Not Governed by § 112, ¶ 6.

As with the preceding terms, this term is not governed by § 112, ¶ 6 for the same reasons as the previous terms. *See supra* § IV.M–N. As with the preceding terms, since this term does not use the word "means" there is a presumption that § 112, ¶ 6 does not apply. *Williamson*, 792 F.3d at 1348. In addition, the claim itself recites sufficient structure for performing the claimed function and, as such, Citrix cannot overcome the presumption that § 112, ¶ 6 does not apply. *See id.*; *Entrust Datacard Corp.*, 2018 WL 3599217, at *10l.

As a threshold matter, the term "compression assistance data generator" is not a nonce word. Ex. 1 ¶¶ 109-111. Rather, it is a structural term that connotes sufficient structure to a POSA for performing the claimed functions and, as such, does not invoke § 112, ¶ 6. *Id.*

Courts have routinely held that generator terms with preceding structural modifiers connote structure and are therefore not governed by § 112, ¶ 6. For example, in *Maxell Ltd. v. Apple Inc.*, the Court held that the term "ringing sound generator" was not governed by § 112, ¶ 6 because the term, when read in light of the claim language and patent specification, was a structural term for performing the claimed function. *See* No. 5:19-CV-00036-RWS, 2020 WL 10456875, at *12–14

(E.D. Tex. Mar. 18, 2020).

As another example, in *Sas Institute Inc. v. World Programming Ltd.*, the Court found that the term "graph generator module" was not governed by § 112, ¶ 6 because the term "graph generator," when read in light of the claim language and patent specification, connoted sufficient structure in the relevant art to avoid application of § 112, ¶ 6. *See* No. 2:18-CV-295- JRG, 2020 WL 569856, at *15–16 (E.D. Tex. Feb. 5, 2020).

In the present case, the term "compression assistance data generator" is a structural term that, when read in light of the intrinsic evidence, connotes sufficient structure to one of ordinary skill in the art for performing the function of receiving an input comprising said second graphics data and producing an output comprising compression assistance data. Ex.1 ¶¶ 109-111; *see also Entrust Datacard Corp.*, 2018 WL 3599217, at *10 (holding term "card transport mechanism" with structural modifiers not subject to § 112, ¶ 6).

For example, the '147 patent provides specific examples of compression assistance data that can be generated by the compression assistance data generator, stating:

> According to preferred embodiments of the invention, compression assistance data includes motion vector data. Some examples of other types of compression assistance data which may be provided when encoding images with MPEG4 data compression are:
>
>> which parts of a scene—if any—to encode as separate objects (as there is a maximum number)
>> what form of encoding to use on the objects
>> whether to encode the shapes as transparent objects or solids
>> how often to transmit full images rather than simply changes from a previous image (as there is a trade-off between error corrections and bandwidth)
>> whether or not to use overlapped motion estimation.
>
> The criteria used in making these decisions include:
>
>> processing time/effort required to make an analysis the bandwidth 'budget' left minimum image quality constraints.

Ex. 2 at 4:38-55.  In describing the embodiment set forth in Fig. 6, the '147 patent states:

36

> FIG. 6 schematically illustrates features of an embodiment of a single game server in the bank **50** of game servers. User input **64** comes in through a network interface **70** into a central processing unit (CPU) **72** of a conventional personal computer (PC), on which is running a conventional PC game program. The game programs sends a first set of graphics instructions to a first graphics processing unit (GPU**1**) **76** which is intercepted by an instruction interception module **74**, which may be embodied as a software wrapper or hardware form. The first set of instructions, including vertex data, transformation data and texture data are passed to GPU**1** **76** whilst a specially manipulated version of the instructions is generated and passed to a second graphics processing unit (GPU2) **78**. Both the GPUs may be provided on a common graphics card. GPU**1** **76** renders the image data as the game intended whilst **GPU2 78 is used to render specially adapted graphics data from which to extract compression assistance data used for compression, e.g. motion vectors**. Each image frame is to be divided into blocks of pixels and then for each block, where possible, the x,y co-ordinates of that block of pixels are found in the previous image frame. A Digital Signal Processing unit (DSP) **84** uses the compression assistance data from GPU**2** to compress the image data from GPU**1**, using a known video compression algorithm, such as MPEG-4, and passes the resulting compressed video stream **86** to the CPU **72** for transmission across the network **54**. Handshake signaling **88** between the DSP **88** and the CPU **72** is used for quality control if there is congestion on the network.

Ex. 2 at 15:44-16:4 (emphasis added); *see also id.* at Abstract (indicating that GPU is used "to extract compression assistance data used for compression, e.g., motion vectors"), 7:33-37.  In other words, the '147 patent specification indicates that the claimed "compression assistance data generator" can be part of a graphics processor module, which is already claimed in claim 21 of the '147 patent.

As demonstrated above, the term "compression assistance data generator" is accompanied by a detailed description of its operation to move it out of the means-plus-function ambit, since sufficient structural meaning is conveyed to a POSA.  Ex. 1 ¶¶ 109-111.

Based on the foregoing, claim 21 of the '147 patent recites sufficient structure – the claimed "compression assistance data generator" – for performing the claimed function of "receiving an input comprising said second graphics data and producing an output comprising compression assistance data."  *Id.*  As a result, § 112, ¶ 6 does not apply and the inquiry should end.  If § 112, ¶ 6 does not apply, Citrix makes no argument for an alternative construction. And so, plain and

37

ordinary meaning is appropriate. *See Phillips*, 415 F.3d at 1314.

### 2.     In the Alternative, if Governed by § 112, ¶ 6, T5.2 Has Identified the Correct Function and Corresponding Structure.

To the extent the Court determines that the term "compression assistance data generator" is governed by § 112, ¶ 6, which it should not, the parties agree on the corresponding function being "processing said second set of instructions" and "producing an output comprising second graphics data." In terms of the corresponding structure, T5.2 proposes that the corresponding structure is:

> software or hardware configured to implement the algorithms disclosed at '147 patent, 6:4-20, 6:46-7:37, 9:51-61, 10:1-16, 10:21-36, 11:21-13:42, 13:53-15:26, 15:53-64, 16:63-17:36, 17:45-18:26, 18:34-36, 18:46, 19:1-30, 20:19-50, 20:54-21:9 and/or Figs. 1, 2, 6, 8, 9, 10 and equivalents thereof.

Ex. 1 ¶¶ 112-116. As shown above, the parties agree in many respects on the structure that corresponds to the claimed functions (the underlined portions overlap between the parties' positions). T5.2's proposed structure differs in two respects.

First, it makes clear that the structure can be "software or hardware." This is consistent with the intrinsic evidence, which indicates that the graphics processor module, including the processing functions within the graphics processor module, can be implemented as software or hardware. *See, e.g.*, Ex. 2 at 15:44-16:4, 6:21-33, 9:1-18. This is also consistent with the parties' agreed construction for the term "graphics processor module (GPM)." Dkt. 91 at 1; Ex. 1 ¶¶ 112-116. Second, T5.2's proposed construction identifies additional portions of the patent specification that correspond to the structure that performs the claimed functions. *See* 35 U.S.C. § 112, ¶ 6.

### P.     Term #16:     "…said different graphics texture instructions define at least one texture attribute which is arranged to be substantially unique to an area within an image frame in the second graphics data."[22]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning. No construction | Indefinite. |

---

[22] Ex. 2, claim 7.

| necessary. | |
|---|---|

As an initial matter, a party may not seek to invalidate a claim as indefinite without disclosing such contention in its invalidity contentions. *Silicon Labs.*, 2016 WL 791792 at *3; *MorphoTrust USA*, 132 Fed. Cl. at 420. Citrix's invalidity contentions fail to disclose its contention that claim 7 of the '147 patent is indefinite, which is fatal to its claim of indefiniteness as to this claim. Ex. 10, Citrix's Inv. Cont. at 125-128.

Moreover, no construction is necessary for this term. A POSA would understand the plain and ordinary meaning of the term "at least one texture attribute which is arranged substantially unique to an area within an image frame" to mean a texture attribute which is arranged to be to a large extent, but not necessarily entirely, unique to an area within an image frame. Ex. 1 ¶¶ 117-118.

The Federal Circuit explains that terms of degree "such as 'substantially' do not render patent claims so unclear as to prevent a person of ordinary skill in the art from ascertaining the scope of the claim." *Tinnus Enterprises v. Telebrands Corporation*, 733 Fed. Appx. 1011, 1018 (Fed. Cir. 2018) ("substantially filled" not indefinite) (quoting *Deere & Co. v. Bush Hog*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) ("substantially planar" not indefinite)) (internal quotations omitted). Words like "substantially" are merely descriptive terms that are used to avoid a strict numerical boundary to the specified parameter. *Anchor Wall Sys. v. Rockwood Retaining Walls*, 340 F.3d 1298, 1310–11 (Fed. Cir. 2003). "As long as claim terms satisfy [the *Nautilus*] test, relative terms and words of degree do not render patent claims invalid." *One-E-Way v. Int'l Trade Comm'n*, 859 F.3d 1059, 1063 (Fed. Cir. 2017); *accord Apple v. Samsung Elecs.*, 786 F.3d 983, 1002 (Fed. Cir. 2015), *rev'd and remanded on other grounds*, 137 S. Ct. 429 (2016) ("substantially centered" not indefinite); *see also Climb Tech. v. Verble*, No. 1:05-CV-864-LY, 2008 WL 11334955, at *7 (W.D. Tex. March 27, 2008) ("substantially no force" not indefinite). "All that is required is some

standard for measuring the term of degree." *Exmark Manuf. Co. v. Briggs and Stratton Power Products Group*, 879 F.3d 1332, 1346 (Fed. Cir. 2018) ("substantially straight" not indefinite).

In the context of the '147 Patent claims, this phrase is not indefinite. For example, the claims refer to "a first set of instructions comprises graphics texture instructions and wherein said second set of instructions comprise different graphics texture instructions" and that the "different graphics texture instructions define at least one texture attribute which is arranged to be substantially unique to an area within an image." Ex. 2 at 22:1-8. In other words, two different sets of graphics texture instructions exist and one of them defines at least one texture attribute which is arranged to be to a large extent, but not necessarily entirely, unique to an area within an image frame.

Based upon the claim language, a POSA also would understand that the term "at least one texture attribute which is arranged substantially unique to an area within an image frame" means a texture attribute which is arranged to be to a large extent, but not necessarily entirely, unique to an area within an image frame, which is consistent with its plain and ordinary meaning. Ex. 1 ¶¶ 117-118; *see LNP Engineering Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1354 (Fed. Cir. 2001) (rejecting claim of indefiniteness) ("The meaning of the word 'substantially' is 'largely but not wholly that which is specified.'"); *Ecolab v. Envirochem*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) ("substantially uniform" means "largely, but not wholly, in the same form"); *Larada Sciences, Inc. v. Pediatric Hair Solutions Corporation*, 2019 WL 4024956, *14–15 (W.D.N.C. 2019) ("along substantially only one side" is not indefinite because a POSA "would be able with reasonable certainty to interpret the 'substantially only' claim language to mean that the ports are positioned largely but not entirely on one side of the applicator's fingers and that the treatment site is similarly largely but not entirely on one side of the applicator.").

Dated: November 4, 2025

Respectfully submitted,

/s/ Alexander D. Brown

**THE CONCEPT LAW GROUP, P.A.**
Alexander D. Brown, Esq.
Florida Bar Number: 752665
abrown@conceptlaw.com
Scott D. Smiley, Esq.
Florida Bar Number: 678341
scott@conceptlaw.com
Robert C. Kain, Esq.
Florida Bar Number: 266760
rkain@conceptlaw.com
The Concept Law Group, P.A.
6400 N. Andrews Ave., Suite 500
Fort Lauderdale, FL 33309
Telephone: (754) 300-1500

**DINOVO PRICE LLP**
Adam G. Price, Esq.
Admitted *pro hac vice*
aprice@dinovoprice.com
Christopher V. Goodpastor, Esq.
Admitted *pro hac vice*
cgoodpastor@dinovoprice.com
Gregory S. Donahue, Esq.
Admitted *pro hac vice*
gdonahue@dinovoprice.com
Gabriel R. Gervey, Esq.
Admitted *pro hac vice*
ggervey@dinovoprice.com
Michael D. French, Esq.
Admitted *pro hac vice*
mfrench@dinovoprice.com
DiNovo Price LLP
7000 N. MoPac Expressway, Suite 350
Austin, TX 78731
Telephone: (512) 727-6691

**ATTORNEYS FOR PLAINTIFF T5.2 LTD.**

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2025, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By: */s/ Alexander D. Brown*
Alexander D. Brown, Esq.